CADES SCHUTTE
A Limited Liability Law Partnership

PHILIP J. LEAS                     1467-0
ELIJAH YIP                         7325-0

1000 Bishop Street, Suite 1200
Honolulu, HI  96813-4212
Telephone:  (808) 521-9200
FAX:  (808) 521-9210
Email:  pleas@cades.com
Email:  eyip@cades.com


Attorneys for Plaintiff
WOND FAMILY KAPALAMA, LLC

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| WOND FAMILY KAPALAMA, LLC, a Hawai'i limited liability company,<br><br>          Plaintiff,<br><br>     v.<br><br>CONTINENTAL TIRE THE AMERICAS, LLC, an Ohio limited liability company,<br><br>          Defendant. | CIVIL NO.<br><br>**COMPLAINT; JURY DEMAND; SUMMONS** |

## COMPLAINT

COMES NOW Plaintiff WOND FAMILY KAPALAMA, LLC, a Hawaiʻi limited liability company ("**Plaintiff**"), by and through its undersigned attorneys, and for its Complaint against Defendant CONTINENTAL TIRE THE AMERICAS, LLC, an Ohio limited liability company ("**Continental Tire**"), alleges and avers as follows.

## INTRODUCTION

1.     This is a civil action brought pursuant to the Comprehensive Environmental Response, Compensation and Liability Act ("**CERCLA**"), 42 U.S.C. § 9607 *et seq.*, the Hawaii Environmental Response Law ("**HERL**"), Hawaiʻi Revised Statutes ("**HRS**") chapter 128D, and Hawaiʻi common law for (i) reimbursement of response costs in response to the release of hazardous substances on property formerly occupied and controlled by Continental Tire, (ii) a declaratory judgment as to liability for future response costs, and (iii) breach of contract.

## PARTIES

2.     Plaintiff WOND FAMILY KAPALAMA, LLC is a limited liability company organized under the laws of the State of Hawaiʻi.  Members of WOND FAMILY KAPALAMA, LLC are citizens of Hawaiʻi, California, Indiana, Georgia, Maryland, Massachusetts, and Washington D.C.

ImanageDB:3770933.4

3.      Defendant CONTINENTAL TIRE THE AMERICAS, LLC is a limited liability company organized under the laws of the state of Ohio.

4.      Continental Tire is registered to do business in the state of Hawai'i. Continental Tire has its principal place of business in the state of South Carolina.

5.      None of the members of WOND FAMILY KAPALAMA, LLC are citizens of the states of South Carolina or Ohio.

## JURISDICTION AND VENUE

6.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 42 U.S.C. § 9613(b).  This action arises under Section 107(a) of CERCLA, 42 U.S.C. § 9607(a).

7.      This Court has supplemental jurisdiction over the claims in this action that arise out of State law pursuant to 28 U.S.C. § 1367.

8.      This Court also has diversity jurisdiction over this action pursuant to 28 U.S.C. § 1332 because Plaintiff and Continental Tire are citizens of different States, and the amount in controversy exceeds the value of $75,000.00.

9.      Venue is proper in the District of Hawai'i pursuant to 28 U.S.C. § 1391(b) and Section 113(b) of CERCLA, 42 U.S.C. § 9613(b), because the release or threatened release of hazardous substances that gave rise to the claims in this action occurred in this district.

ImanageDB:3770933.4

## ALLEGATIONS COMMON TO ALL COUNTS

**I.      The Environmental Hazard Evaluation and Remediation Process**

10.     In order to identify the presence, type, and extent of contamination on a site, the owner or prospective purchaser of the site commonly performs a Phase I Environmental Site Assessment ("***Phase I ESA***" or "***Phase I***").  A Phase I ESA is conducted through review of records and interviews of individuals with knowledge about the use and condition of the site; it does not involve onsite sampling and testing of materials on the property.  The objective of a Phase I ESA is to identify the existence of recognized environmental conditions on the site, *i.e.*, the presence or likely presence of any hazardous substances or petroleum products in, on, or at the site: (1) due to release to the environment; (2) under conditions indicative of a release to the environment; or (3) under conditions that pose a material threat of a future release to the environment.

11.     If a Phase I ESA identifies a recognized environmental condition on the site, or if the owner/prospective purchaser of the site desires a more thorough investigation, a Phase II Environmental Site Assessment ("***Phase II ESA***" or "***Phase II***") may be conducted to sample or test for specific hazards that may have been identified in the Phase I ESA.  The results of the Phase II ESA will help determine if the site warrants further investigation or remediation.

ImanageDB:3770933.4

12.    In conducting a Phase II investigation, it is common practice to determine the presence of contaminants at concentrations exceeding designated screening levels.   The Hazard Evaluation and Emergency Response Office ("***HEER***") of the Department of Health, State of Hawaiʻi ("***HDOH***")—the agency charged with administration and enforcement of HERL, the Hawaiʻi counterpart to CERCLA—publishes screening levels for various chemicals known as Environmental Action Levels ("***EALs***").   The HDOH EALs are available in lookup tables appended to the HDOH's guidance document entitled *Evaluation of Environmental Hazards at Sites with Contaminated Soil and Groundwater* published in Fall 2011 and revised in January 2012 ("***Evaluation of Environmental Hazards***") or an Excel-based version of the lookup tables called the "EAL Surfer."

13.    The HDOH Tier 1 EALs for unrestricted land use ("***HDOH Tier 1 Unrestricted EALs***") are the most conservative non-site specific screening levels published by HEER.   Less conservative than the HDOH Tier 1 Unrestricted EALs are the HDOH Tier 1 EALs for commercial/industrial land use ("***HDOH Tier 1 C/I EALs***").[1]

---

[1] HDOH Tier 1 C/I EALs are sometimes referred to as "Tier 2 EALs," although that is somewhat of a misnomer, as DOH Tier 2 EALs are alternative screening levels not corresponding directly to land use restrictions.

ImanageDB:3770933.4

14.     According to the *Technical Guidance Manual for the Implementation of the Hawai'i State Contingency Plan* ("***TGM***") published by HEER, "[t]he HDOH Tier 1 EALs may be used to identify contamination 'above levels of potential concern.'" TGM at 2-21.  The TGM also states that "[t]he HEER Office considers sites where environmental contamination concentrations exceed relevant HDOH HEER Office Tier 1 Environmental Action Levels (EALs) to be sites where hazardous substances may present an unacceptable risk or substantial endangerment to health or the environment." *Id.* at 2-19.

15.     According to HEER: "In general, land-use restrictions inherent in the selection of EALs from the Tier 1 lookup tables (or assumptions used in site-specific risk assessments) should be kept as minimal as possible.  **When preparing [environmental hazard evaluations] for commercial/industrial sites, concentrations of chemicals in impacted soils left in place should always be compared to action levels for both unrestricted land use and commercial/industrial land use only.**" *Evaluation of Environmental Hazards* at 2-18 (emphasis in original).

16.     If it is determined that remediation of identified hazards on the site is warranted, a Phase III Environmental Site Assessment ("***Phase III ESA***" or "***Phase III***") is conducted.  A Phase III ESA involves the characterization of the extent of contamination at the site, the design and implementation of a plan of

ImanageDB:3770933.4

remediation of the contamination, and the preparation of reports demonstrating that the remediation plan was implemented successfully.

## II.   The Parties' Interests in the Subject Property

17.     Plaintiff is the current fee owner of real property known as Lot 1, Lot 2, and Lot 3 in the Monmouth Industrial Subdivision in the Kapalama Section, and designated as Tax Map Key No. (1) 1-5-021:024 (the "*Property*").

18.     On or about February 12, 1959, CLARK INVESTMENT CORPORATION ("*Clark Investment*"), as sublessor, and MELIM SERVICE & SUPPLY CO. LTD. ("*Melim*"), as sublessee, entered into a written sublease of the Property.

19.     On or about December 29, 1975, the sublease between Clark Investment and Melim was amended or assigned (the amended/assigned sublease is hereinafter referred to as the "*Sublease*") to name as sublessee THE GENERAL TIRE AND RUBBER COMPANY, an Ohio corporation ("*General Tire*"). General Tire is the corporate predecessor of Continental Tire.   Accordingly, Continental Tire is the successor sublessee of the Property under the Sublease.

20.     On or about November 14, 2000, Kapalama Associates LLC ("*Kapalama Associates*") acquired the interest of Clark Investment in the Sublease and became the successor sublessor of the Property under the Sublease.

ImanageDB:3770933.4

21.     Plaintiff acquired the fee interest in the Property and all of Kapalama Associate's rights and claims against Continental Tire, including the claims against Continental Tire that are the subject of this action.

22.     Covenant 19 of the Sublease provides:

> That at the end of the said term, or other sooner determination of this lease, the Lessee will peaceably and quietly deliver up to the Lessors possession of the land hereby demised, together with all erections and improvements upon or belonging to the same, by whomsoever made, in good repair, order and condition, reasonable wear and tear excepted.

23.     The term of the Sublease expired on October 31, 2012, after which Continental Tire stopped paying rent.

## III.   Initial Environmental Hazard Evaluation of the Property

24.     For most of the term of the Sublease, Continental Tire and its predecessors in interest continuously operated tire and auto services on the Property.  In connection therewith, Continental Tire and its predecessors in interest used hydraulic hoists, underground lines, and tanks on the Property.

25.     Continental Tire ceased business operations at the Property prior to 2012.

26.     Continental Tire and its predecessors in interest disposed of hazardous substances on the Property during the term of the Sublease.

ImanageDB:3770933.4

27.     Bureau Veritas North America, Inc. ("**Bureau Veritas**"), under commission by Plaintiff, prepared a Phase I ESA Report concerning the Property dated August 12, 2011 (the "**BV Phase I Report**").

28.     The BV Phase I Report identified several recognized environmental conditions including: (1) the inconsistency of certain records regarding the location, removal, and subsequent closure of an underground storage tank used at the facility; (2) lack of documentation regarding remedial work after a petroleum release was discovered on the Property; and (3) the likelihood of contamination from prior automotive repair and services conducted on the premises.

29.     Based on the findings in the BV Phase I Report, Bureau Veritas recommended that a Phase II ESA be conducted for the Property.

30.     Nine months prior to the expiration of the Sublease, on January 25, 2012, Michael M. Wond, on behalf of Plaintiff, contacted Continental Tire to request access to the Property to conduct a Phase II ESA.

31.     On February 10, 2012, Mr. Wond received an email from Continental Tire indicating that the "request to enter the property located on Colburn Street in the Kapalama Section has been denied."

32.     As of May 2012—five months before the expiration of the Sublease—Continental Tire expressly denied an obligation to perform further environmental

testing of the Property. Notwithstanding the disclaimer, Continental Tire considered conducting additional environmental investigation of the Property.

33. Continental Tire finally retained ENPRO Environmental ("***ENPRO***") to conduct a Phase II ESA. ENPRO initiated the Phase II investigation on September 14, 2012 approximately a month and a half before the expiration of the Sublease.

34. On October 15, 2012, counsel for Plaintiff (Philip Leas) advised counsel for Continental Tire that it must complete its environmental work on the Property rent by the end of the month when the Sublease expires or carryover rent would accrue.

35. ENPRO completed its testing for the Phase II ESA on November 8, 2012.

36. ENPRO released a report of its Phase II ESA for the Property dated December 11, 2012 (the "***ENPRO Phase II Report***"). A copy of the ENPRO Phase II Report was not furnished to Plaintiff until December 22, 2012 despite Mr. Leas' repeated requests for the report dating back to October 10, 2012.

37. ENPRO detected the following chemicals at levels above the HDOH Tier 1 C/I EAL:

- Benzo(a)pyrene was detected in one near surface soil sample;
- Lead was detected in two near surface soil samples; and

- Lead was initially detected at concentrations above the HDOH Tier 1 C/I EAL in one groundwater sample, but further testing detected no concentration of lead above the HDOH Tier 1 C/I EAL.

38.   ENPRO recommended excavating the near surface soil in the immediate vicinity of the sample locations where contaminants were detected at concentrations exceeding HDOH Tier 1 C/I EALs.

39.   On behalf of Plaintiff, Bureau Veritas reviewed the ENPRO Phase II Report.  In a letter to Mr. Wond dated February 20, 2013, Bureau Veritas identified numerous conceptual and technical errors in the ENPRO Phase II Report.  A copy of Bureau Veritas' comment letter was provided to the HDOH.

40.   Continental Tire commissioned ENPRO to conduct a Phase III remediation of the Property in accordance with the recommendations in the ENPRO Phase II Report.   ENPRO conducted its Phase III remediation from February 13 to 21, 2013.   ENPRO excavated the areas in which it detected benzo(a)pyrene and lead above the HDOH Tier 1 C/I EAL.  ENPRO also removed part of a former oil-water separator discovered in the vicinity of the area in which soil contaminated by benzo(a)pyrene was excavated.  According to ENPRO, post-excavation sampling of the excavated areas did not detect concentrations of chemicals exceeding the HDOH Tier 1 C/I EAL.  Based on these findings, ENPRO recommended no further remedial action.   ENPRO described its Phase III

ImanageDB:3770933.4

remediation activity, sampling results, and its recommendations in a report dated March 12, 2013 (the "***ENPRO Phase III Report***").

41.    Plaintiff commissioned Bureau Veritas to test the areas excavated by ENPRO.   Sampling of soil collected from the open excavation areas detected petroleum (TPH-RRO) and benzo(a)pyrene at concentrations above the HDOH Tier 1 Unrestricted EAL.    Bureau Veritas advised that further remediation and testing was required to complete the environmental cleanup of the Property.

42.    On February 28, 2013, in-house counsel for Continental Tire (Kevin Collins) sent an email to Mr. Leas asserting that "the remediation of the Wond property is now complete."

43.    On March 22, 2013, Mr. Collins sent an email to Mr. Leas representing that the fact that the sampling results in the ENPRO Phase III Report did not detect contaminants at concentrations exceeding HDOH Tier 1 C/I EALs supported the conclusion that no further action with respect to the Property is required.    Continental Tire stated that the DOH had been notified of the remediation efforts conducted by ENPRO, and that after the ENPRO Phase III Report is filed with the DOH, the DOH is anticipated to issue a No Further Action determination for the Property.

ImanageDB:3770933.4

44. Mr. Leas expressed his disagreement with Continental Tire's assessment that the HEER Office would issue a No Further Action determination. Mr. Leas informed Continental Tire that carryover rent continued to accrue.

45. Continental Tire retained Lisa Bail as outside counsel. In a letter to Mr. Leas dated September 4, 2013, Ms. Bail stated that cleanup of the Property to HDOH Tier I EALs was not required, and that "the DOH has stated that it will issue a determination of 'no further action' ("NFA") for the property under the commercial/industrial EAL." In the same letter, Ms. Bail acknowledged Continental Tire's duty to remediate the Property to "DOH Tier 2 EALs."

46. In a letter dated September 23, 2013, the HDOH informed Continental Tire that the ENPRO Phase II Report "has been determined to be deficient in many HDOH requirements and cannot be considered appropriate for characterizing the site or determining necessary remedial actions. Some but not all of the deficiencies can be found in Bureau Veritas' letter of February 20, 2013 attached. Therefore, the report is rejected as a Phase II characterization based on numerous technical errors. HDOH requires a full site characterization of 1385 Colburn Street following the procedures detailed in the TGM."

47. The HDOH's September 23, 2013 letter further refused to approve the remediation efforts undertaken by ENPRO: "Due to the substantial amount of technical errors—including the sampling and analytical errors, and lack of

ImanageDB:3770933.4

sufficient detail—the Phase II report is inadequate for determining additional remedial actions for the site and HDOH cannot accept the Phase III report or issue a determination of No Further Action for the soil removal action."

## IV.   Continental Tire's Follow-Up Site Investigation

48.   Continental Tire retained Kevin S. Kennedy Consulting, LLC ("***Kennedy Consulting***") to conduct a follow-up investigation of the Property (the "***Follow-Up Site Investigation***").   Kennedy Consulting conducted the Follow-Up Site Investigation in March-April of 2014.   Kennedy Consulting released its Follow-Up Site Investigation Report on May 20, 2014 (the "***Kennedy Follow-Up Site Investigation Report***").

49.   The stated objective of the Follow-Up Site Investigation was to assess the presence of contaminants of concern and determine if they have been adequately removed or remediated from the Property below HDOH Tier 1 C/I EALs.

50.   Unlike the ENPRO Phase II ESA, the Follow-Up Site Investigation detected the presence of lead and total petroleum hydrocarbons as lube oil range organics ("***TPH-ORO***") in soil samples at concentrations exceeding the respective HDOH Tier 1 C/I EALs.[2]   In addition, the Follow-Up Site Investigation detected

_____

[2] Sampling data for TPH-ORO exceeded the applicable HDOH Tier 1 C/I EAL, but Kennedy Consulting apparently applied an EAL for TPH-ORO of a higher concentration than that of the HDOH Tier 1 C/I EAL and accordingly

ImanageDB:3770933.4

the presence of mercury, lead, TPH-O, polychlorinated biphenyls ("*PCBs*"), and semi-volatile organic compounds ("*SVOCs*") at concentrations exceeding the respective HDOH Tier 1 Unrestricted EALs.

51.     The Kennedy Follow-Up Site Investigation Report requested that the HEER Office issue a ruling of a "Conditional No Further Action" for the Property with the condition of the implementation of a site-specific Environmental Hazard Management Plan ("*EHMP*").

52.     By letter dated July 21, 2014, the HEER Office informed Continental Tire that it had reviewed the Kennedy Follow-Up Site Investigation Report and that it did not concur with the request for a "Conditional No Further Action" determination at this time.  The HEER Office stated that "[t]his issue may be revisited following the capping of the entire site, submittal, and HDOH approval of the site-specific EHMP and or excavation to 2' bgs of soil from the decision units 1 & 2."

53.     Subsequent to the July 21, 2014 letter from the HEER Office, Continental Tire has taken, and continues to take, the position that: (1) leaving the contaminated soil in place and covering the entire Property with a cap (the "*Capping Remedy*") satisfies Continental Tire's obligations under the Sublease to return the Property to Plaintiff at the end of the lease term "in good repair, order

---

concluded that lead was the only contaminant of concern present at the Property at concentrations exceeding the HDOH Tier 1 C/I EAL.

and condition, reasonable wear and tear excepted" because it would be sufficient to obtain a "Conditional No Further Action" determination from the HDOH; and conversely, that (2) excavating the first two feet of soil on the Property would exceed Continental Tire's obligations under the Sublease because it would remediate the Property to contamination levels below the HDOH Tier 1 Unrestricted Use EALs, which Continental Tire denies having an obligation to do.

54.    The Capping Remedy would leave contamination in excess of the HDOH Tier 1 C/I EALs on the Property.  As such, the Capping Remedy does not comply with Covenant 19 of the Sublease requiring Continental Tire to return the Property at the end of the lease term "in good repair, order and condition, reasonable wear and tear excepted."

55.    Continental Tire has to date neither installed a cap nor excavated the top two feet of soil on the Property.

## V.    **Plaintiff Chooses a Remedial Alternative**

56.    On or about December 23, 2015, Bureau Veritas on behalf of Plaintiff delivered to the HEER Office Bureau Veritas' draft Remedial Alternatives Analysis ("*RAA*") in which it analyzed four alternatives for responding to the contamination: (1) no remediation at the Property (no action); (2) the Capping Remedy; (3) excavation of soil on the Property to a depth of two feet ("*Alternative 3*"); and (4) excavation of soil on the Property to a depth of four feet.  The draft

ImanageDB:3770933.4

RAA selected Alternative 3 as the preferred alternative based on an evaluation of the four alternatives under the following criteria: overall protectiveness; reduction of toxicity, mobility, and volume through treatment; long-term and short-term effectiveness; implementability; and estimated costs.

57.    In a letter dated March 10, 2016, the HEER Office provided comments to the draft RAA and determined that either the Capping Remedy or Alternative 3 would be acceptable.

58.    On or about July 18, 2016, Bureau Veritas on behalf of Plaintiff submitted its revised RAA to the HEER Office incorporating the comments stated in the HEER Office's March 10, 2016 letter.

59.    In a letter dated August 18, 2016, the HEER Office instructed Plaintiff to select one of the two approved alternatives (the Capping Remedy or Alternative 3) and submit a Removal Action Report when the alternative has been implemented.

60.    On or about September 29, 2016, Plaintiff published a notice in the *Honolulu Star-Bulletin* newspaper disclosing its proposed cleanup of the Property in accordance with Alternative 3.  Plaintiff made the RAA available for review at a local library and invited comments to the same.  No comments were received by the comment deadline of October 29, 2016.

ImanageDB:3770933.4

61.    Plaintiff has commenced remediation of the Property in accordance with Alternative 3.

## COUNT I:
## COST RECOVERY UNDER CERCLA, 42 U.S.C. § 9607(a)

62.    The allegations in paragraphs 1 to 61 above are hereby realleged and incorporated by reference.

63.    The Property constitutes a "facility" as defined in CERCLA, 42 U.S.C. § 9601(9).

64.    Continental Tire is a "person" as defined in CERCLA, 42 U.S.C. § 9601(21).

65.    Continental Tire and its predecessors in interest leased the Property and operated or caused to be operated tire and auto service businesses on the premises.  Such businesses used hydraulic hoists, underground lines, and tanks, which are known sources of environmental contaminants, especially from petroleum products.  As such, Continental Tire and its predecessors in interest constitute the "owner or operator" of a "facility" as those terms are defined in CERCLA, 42 U.S.C. §§ 9601(9) and (20).

66.    Upon information and belief, the use of the Property by Continental Tire and its predecessors in interest caused the release of hazardous substances onto the Property by means including, but not limited to, spilling, leaking,

ImanageDB:3770933.4

pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, or disposing into the environment.

67.     Plaintiff has commenced remediation of the Property in accordance with Alternative 3 and as such has incurred substantial expenses to remediate the release of hazardous substances onto the Property by Continental Tire and/or its predecessors in interest.

68.     The response costs incurred by Plaintiff were necessary and consistent with the National Contingency Plan as set forth in Title 40 of the Code of Federal Regulations, Part 300.

69.     Pursuant to 42 U.S.C. § 9607(a), Plaintiff is entitled to recover from Continental Tire the response costs incurred by Plaintiff.

## COUNT II:
## CONTRIBUTION AND/OR INDEMNITY UNDER
## HERL, HRS § 128D-18(d)

70.     The allegations in paragraphs 1 to 61 above are hereby realleged and incorporated by reference.

71.     The Property constitutes a "facility" as defined in HRS § 128D-1.

72.     Continental Tire constitutes a "person" as defined in HRS § 128D-1.

73.     Continental Tire and its predecessors in interest leased the Property and operated or caused to be operated tire and auto service businesses on the premises.  Such businesses used hydraulic hoists, underground lines, and tanks,

ImanageDB:3770933.4

which are known sources of environmental contaminants, especially from petroleum products. As such, Continental Tire and its predecessors in interest constitute the "owner or operator" of a "facility" as those terms are defined in HRS § 128D-1.

74.     Upon information and belief, the use of the Property by Continental Tire and its predecessors in interest caused the release of hazardous substances onto the Property by means including, but not limited to, spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, or disposing into the environment.

75.     Plaintiff has commenced remediation of the Property to excavate the top two feet of soil on the Property. As such, the release of hazardous substances onto the Property by Continental Tire and/or its predecessors in interest caused Plaintiff to incur response costs.

76.     The response costs incurred by Plaintiff were necessary and consistent with HRS Chapter 128D, the State Contingency Plan of the State of Hawai'i as set forth in Title 11 of the Hawai'i Administrative Rules Chapter 451, and other applicable administrative rules of the State of Hawai'i.

77.     Pursuant to HRS § 128D-18(d), Plaintiff is entitled to contribution and/or indemnity from Continental Tire for the responses costs incurred by Plaintiff.

## COUNT III:
## DECLARATORY JUDGMENT OF LIABILITY
## FOR FUTURE RESPONSE COSTS

78.     The allegations in paragraphs 1 to 61 above are hereby realleged and incorporated by reference.

79.     An actual and substantial controversy now exists between Plaintiff and Continental Tire as to Continental Tire's liability for future response costs associated with the Property.

80.     Plaintiff seeks a declaration of its rights and Continental's liability for future response costs pursuant to the Declaratory Judgments Act, 28 U.S.C. § 2201 *et seq.*, and CERCLA, 42 U.S.C. §§ 9607(a) and 9613(g)(2).

81.     CERCLA, 42 U.S.C. § 9613(g)(2) provides: "In any such action described in this subsection [relating to cost recovery actions under 28 U.S.C. § 9607], the court shall enter a declaratory judgment on liability for response costs or damages that will be binding on any subsequent action or actions to recover further response costs or damages."

82.     Plaintiff will continue to incur response costs associated with the Property, including but not limited to enforcement costs that are recoverable as response costs under CERCLA, 42 U.S.C. § 9601(25).

ImanageDB:3770933.4

83.    Plaintiff is entitled to entry of a declaratory judgment that Continental Tire is liable for future response costs incurred by Plaintiff in evaluating, removing, and remediating the contamination on the Property.

**COUNT IV:**
**BREACH OF CONTRACT**

84.    The allegations in paragraphs 1 to 61 above are hereby realleged and incorporated by reference.

85.    Continental Tire is contractually bound to honor the obligations contained in the Sublease.

86.    Covenant 13 of the Sublease provided: "That the Lessee will permit the Lessors and their agents, at all reasonable times during the said term, to enter the premises and examine the state of repair and condition thereof, and will repair and make good all defects of which notice shall be given by the Lessors, or their agents, within thirty (30) days after the giving of such notice."  Continental Tire breached Covenant 13 of the Sublease when it denied Plaintiff access to the Property to conduct a Phase II ESA nine months before the expiration of the term of the Sublease.

87.    Covenant 9 of the Sublease required Continental Tire to keep the Property "in a strictly clean, neat and sanitary condition[.]"  The release of hazardous substances onto the Property by Continental Tire and its predecessors in interest is a breach of the foregoing provision of Covenant 9.

ImanageDB:3770933.4

88.    Covenant 19 of the Sublease provided: "That at the end of the said term, or other sooner determination of this lease, the Lessee will peaceably and quietly deliver up to the Lessors possession of the land hereby demised, together with all erections and improvements upon or belonging to the same, by whomsoever made, in good repair, order and condition, reasonable wear and tear excepted."   Continental Tire breached Covenant 19 by releasing hazardous substances in excess of the HDOH Tier 1 C/I EAL onto the Property during the term of the Sublease and delivering possession of the Property to Plaintiff at the end of the Sublease with such hazardous substances remaining thereon.

89.    Covenant 18 of the Sublease provided that "the Lessee will not commit or suffer any act or neglect whereby the demised premises or any erection or improvement thereon or the estate of the Lessee in the same at any time during the said term shall be come subject to any attachment, judgment, lien, charge, or encumbrance whatsoever except as hereinafter provided, and shall indemnify and hold harmless the Lessors against all liens, charges, and encumbrances and all expenses resulting therefrom, including attorneys' fees."   Continental Tire is in breach of Covenant 18 because it and its predecessors in interest released hazardous substances onto the Property, and as a result, the HEER Office will require the Property to be subject to an EHMP regardless of which approved cleanup alternative (*i.e.*, the Capping Remedy or Alternative 3) is chosen.   An

EHMP is enforced by way of a covenant that runs with title in the Property, and the EHMP will cause Plaintiff to continue to incur future costs as a consequence of the contamination for which Continental Tire is responsible.

90.     Plaintiff has sent invoices to Continental Tire for carryover rent for periods after the expiration of the Sublease during which the Property was not restored to the condition that Continental Tire was obligated to return the Property to Plaintiff pursuant to Covenants 9 and 19 of the Sublease.  Continental Tire has not paid such invoices.

91.     Continental Tire's breaches of the Sublease have caused Plaintiff to sustain damages including but not limited to: costs to perform environmental investigation that Continental Tire should have completed prior to the expiration of the Sublease, costs to remediate the contamination on the Property, and lost rent during the period following the expiration of the Sublease up until the time the Property is restored to the condition in which Continental Tire is obligated to return the Property to Plaintiff pursuant to Covenants 9 and 19 of the Sublease.

## COUNT V:
## <u>INDEMNITY</u>

92.     The allegations in paragraphs 1 to 61 above are hereby realleged and incorporated by reference.

93.     Covenant 9 of the Sublease provided, in pertinent part, that Continental Tire "will indemnify and hold harmless the Lessors and their

ImanageDB:3770933.4

respective estates and effects against all actions, suits, damages and claims by whomsoever brought or made by the reason of the non-observance or non-performance of the said rules, regulations, ordinances and laws or of this covenant[.]"

94.    Pursuant to CERCLA and HERL, the release of hazardous substances into a facility renders the owner strictly liable for all costs of removal or remedial actions.

95.    Continental and its predecessors in interest released hazardous substances onto the Property.

96.    The HEER Office has required Plaintiff to engage in removal actions with respect to the hazardous substances released onto the Property by Continental Tire and its predecessors in interest.

97.    Pursuant to Covenant 9 of the Sublease, Plaintiff is entitled to indemnification from Continental Tire of the costs to remediate the hazardous substances on the Property.

## PRAYER FOR RELIEF

FOR THE FOREGOING REASONS, Plaintiff respectfully requests that this Court enter judgment and provide the following relief:

A.    A judgment in favor of Plaintiff against Continental Tire awarding

damages in amounts to be proven at trial, including but not limited: to

all costs incurred by Plaintiff in the investigation, clean-up, and remediation of the Property and rent during the period following the expiration of the Sublease up until the time the Property is restored to the condition in which Continental Tire is obligated to return the Property to Plaintiff pursuant to the Sublease;

B.      A declaration that Continental Tire is liable for all future response costs concerning or related to the continuing presence of hazardous substances on the Property;

C.      A declaration that Continental Tire is liable to Plaintiff to contribute to and reimburse Plaintiff, or in the alternative to indemnify Plaintiff, for all damages and costs suffered or to be suffered by Plaintiff resulting from or related in any way to the release of hazardous substances on the Property;

D.      Pre-judgment and post-judgment interest;

E.      Plaintiff's attorney's fees and costs;

F.      Retention of continuing jurisdiction to review Continental Tire's compliance with all judgments and orders entered herein; and

//
//
//
//
//
//

ImanageDB:3770933.4

G.      Such other and further relief as this Court deems just and appropriate
to effectuate a complete resolution of the legal dispute between
Plaintiffs and Continental Tire.

DATED:  Honolulu, Hawaii, December 28, 2016.

CADES SCHUTTE
A Limited Liability Law Partnership


/s/ Elijah Yip
PHILIP J. LEAS
ELIJAH YIP

Attorneys for Plaintiff
WOND FAMILY KAPALAMA, LLC

ImanageDB:3770933.4