IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| WOND FAMILY KAPALAMA, LLC a Hawai`i limited liability company,<br><br>   Plaintiff,<br><br> vs.<br><br>CONTINENTAL TIRE THE AMERICAS, LLC, an Ohio limited liability company,<br><br>   Defendant.<br>_____<br>CONTINENTAL TIRE THE AMERICAS, LLC, an Ohio limited liability company,<br><br>   Third-Party Plaintiff,<br><br> vs.<br><br>MELIM LTD.,<br><br>   Third-Party Defendant.<br>_____ | CIVIL NO. 16-00676 LEK-KJM |

**ORDER GRANTING IN PART AND DENYING PLAINTIFF'S MOTION
FOR PARTIAL SUMMARY JUDGMENT RE: COUNT IV OF COMPLAINT
<u>AND DENYING ALL OTHER MOTIONS FOR SUMMARY JUDGMENT</u>**

   Before the Court are: Defendant/Counterclaimant/Third-Party Plaintiff Continental Tire the Americas, LLC's ("Continental Tire") Motion for Summary Judgment as to Counts I, II, and III of Plaintiff's Complaint ("Continental Tire's Counts I-III Motion"); [filed 10/6/17 (dkt. no. 56);] Continental Tire's Motion for Summary Judgment as to Count IV of Plaintiff's

Complaint ("Continental's Count IV Motion"); [filed 10/6/17 (dkt. no. 60);] Continental Tire's Motion for Summary Judgment as to Count V of Plaintiff's Complaint ("Continental's Count V Motion"); [filed 10/6/17 (dkt. no. 58);] Plaintiff/Counterclaim Defendant Wond Family Kapalama, LLC's ("Wond Family") Motion for Partial Summary Judgment Re: Counts I, II, and III of Complaint ("Wond Family's Counts I-III Motion"); [filed 10/11/17 (dkt. no. 66);] and Wond Family's Motion for Partial Summary Judgment Re: Count IV of Complaint ("Wond Family's Count IV Motion"), [filed 10/6/17 (dkt. no. 62)].

The following memoranda in opposition were filed: Wond Family's memorandum in opposition to Continental's Count IV Motion ("Wond Family's Count IV Opposition"); [filed 11/27/17 (dkt. no. 76);] Continental Tire's memorandum in opposition to Wond Family's Count IV Motion ("Continental's Count IV Opposition"); [filed 11/27/17 (dkt. no. 78);] Wond Family's memorandum in opposition to Continental's Count V Motion ("Wond Family's Count V Opposition"); [filed 12/6/17 (dkt. no. 80)]; Wond Family's memorandum in opposition to Continental's Counts I-III Motion ("Wond Family's Counts I-III Opposition"); [filed 12/18/17 (dkt. no. 83);] and Continental Tire's memorandum in opposition to Wond Family's Counts I-III Motion ("Continental's Counts I-III Opposition"), [filed 12/18/17 (dkt. no. 85)]. On December 13, 2017, Continental Tire filed a reply

in support of Continental's Count V Motion ("Continental's Count V Reply").  [Dkt. no. 82.]

Continental's Count IV Motion and Wond Family's Count IV Motion came on for hearing on December 18, 207, and Continental's Count V Motion came on for hearing on December 27, 2017.  On January 7, 2018, this Court issued an entering order ("1/7/18 EO") finding Continental's Counts I-III Motion and Wond Family's Counts I-III Motion suitable for disposition without a hearing pursuant to Rule LR7.2(d) of the Local Rules of Practice of the United States District Court for the District of Hawai`i ("Local Rules").  [Dkt. no. 97.]  The 1/7/18 EO also informed the parties that Continental's Counts I-III Motion and Wond Family's Counts I-III Motion were denied.  On January 9, 2018, this Court issued an entering order informing the parties of its rulings on Continental's Count IV Motion, Wond Family's Count V Motion, and Continental's Count V Motion ("1/9/18 EO").  [Dkt. no. 98.]  The instant Order supersedes the 1/7/18 EO and the 1/9/18 EO.  For the reasons set forth below, Wond Family's Count IV Motion is granted in part and denied in part, and Continental's Counts I-III Motion, Wond Family's Counts I-III Motion, Continental's Count IV Motion, and Continental's Count V Motion are denied.

# BACKGROUND

Wond Family filed its Complaint on December 28, 2016.[1] It brings this action pursuant to the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. § 9607, *et seq.*, and the Hawai`i Environmental Response Law ("HERL"), Haw. Rev. Stat. Chapter 128D.[2] [Complaint at ¶ 1.] Wond Family asserts federal question jurisdiction over the CERCLA claim and supplemental jurisdiction over the state law claims. [Id. at ¶¶ 6-7 (citing 28 U.S.C. §§ 1331, 1367; 42 U.S.C. § 9613(b)).] The Complaint alleges the following claims: a CERCLA cost recovery claim pursuant to 42 U.S.C. § 9607(a) ("Count I"); a HERL contribution/indemnity claim pursuant to Haw. Rev. Stat. § 128D-18(d) ("Count II"); a claim for a declaratory judgment regarding liability for future response costs ("Count III"); breach of contract ("Count IV"); and a CERCLA and HERL indemnity claim ("Count V").

---

[1] Continental Tire filed its Counterclaim Against Plaintiff Wond Family Kapalama, LLC ("Counterclaim") on January 30, 2017, and its Third-Party Complaint Against Melim, Ltd. ("Third-Party Complaint") on August 21, 2017. [Dkt. nos. 10-1, 42.] Neither the Counterclaim nor the Third-Party Complaint are at issue in the motions addressed in this Order.

[2] Wond Family describes HERL as the Hawai`i counterpart to CERCLA. HERL is administered and enforced by the Hazard Evaluation and Emergency Response Office ("HEER") of the State of Hawai`i Department of Health ("HDOH"). [Complaint at ¶ 12.]

## I.  **The Parties**

Wond Family is the fee owner of the real property at issue in this case – Tax Map Key ("TMK") No. (1)1-5-021:024 ("the Property").[3]  [Concise Statement of Facts in Supp. of Continental's Count IV Motion ("Continental's Count IV CSOF"), filed 10/6/17 (dkt. no. 61), at ¶ 1; Separate & Concise Counter-Statement of Material Facts in Opp. to Continental's Count IV Motion ("Wond Family's Responsive Count IV CSOF"), filed 11/27/17 (dkt. no. 77), at § I (admitting Continental's ¶ 1).]  It was previously owned by individual Wond family members, but they conveyed their interests to the Wond Family Kapalama Trust ("Wond Trust") in the 1960s.  [Wond Count IV Decl.,[4] Exhs. 1-4 (certified copies of Indentures).]  In 2011, the Wond Trust conveyed its interest in the Property to Plaintiff.  [Wond Count IV Decl. at ¶ 8, Exh. 5 (Limited Warranty Deed).]

---

[3] Wond Family describes the Property as Lots 1, 2, and 3 of the Monmouth Industrial Subdivision in the Kapalama Section. [Complaint at ¶ 17.]  The address of the Property is 1385 Colburn Street, Honolulu, Hawai`i 96819.  Waiakamilo Road is on the north of the Property, and Colburn Street is on the east.  On the west side of the Property is a parcel identified as TMK (1) 1-5-021:004, which has the address 505 Waiakamilo Road, Honolulu, Hawai`i 96818 ("Adjoining Property").  [Separate & Concise Statement of Material Facts in Supp. of Wond Family's Count IV Motion ("Wond Family's Count IV CSOF"), filed 10/6/17 (dkt. no. 63), Decl. of Michael M. Wond, Jr. ("Wond Count IV Decl.") at ¶¶ 2-3.]

[4] Michael M. Wond, Jr. ("Wond") is a co-manager of Wond Family.  [Wond Count IV Decl. at ¶ 1.]

Monmouth, Inc. ("Monmouth") was the lessee in a lease on the Property from November 1, 1957 to October 31, 2012 ("the Lease"). Clarke Investment Corporation ("Clarke Investment") acquired Monmouth's interest in the Lease by mesne assignment. [Wond Family's Count IV CSOF at ¶¶ 2-3; Continental's Opp. to Wond Family's Count IV CSOF ("Continental's Responsive Count IV CSOF"), filed 11/27/17 (dkt. no. 79), at § I (admitting Wond Family's ¶¶ 2-3).]

Clarke Investment, as lessor, and Melim Service & Supply Co., Ltd., as lessee, entered into an Indenture of Sublease of the Property ("the Sublease") on February 12, 1959. [Continental's Count IV CSOF, Decl. of Lisa A. Bail ("Bail Count IV Decl."), Exh. A.] Melim Tire & Rubber Co., Ltd. executed an Assignment of Leases ("Assignment") on September 24, 1968,[5] assigning the Sublease to The General Tire and Rubber Company ("General Tire").[6] The Assignment was filed in the Land

---

[5] It is unclear how Melim Service & Supply Co., Ltd. became Melim Tire & Rubber Co., Ltd. It also operated under the name "Melim General Tire Service." For purposes of the motions addressed in this Order, the parties do not dispute that the entities are related, and the Court will refer to them collectively as "Melim."

[6] Wond Family describes General Tire as "the corporate predecessor of Continental Tire," and alleges Continental Tire "is the successor sublessee of the Property under the Sublease." [Complaint at ¶ 19.] Continental Tire, however, denied these allegations because it was "without knowledge or information sufficient to form a belief as to the truth of the allegations of said paragraph." [Continental Tire's Answer to Complaint Filed
(continued...)

Court on March 17, 1969. [Bail Count IV Decl., Exh. B.] The

parties refer to the filing date as the date of the Assignment.

[Continental's Count IV CSOF at ¶ 4; Wond Family's Responsive

Count IV CSOF at § I (admitting Continental's ¶ 4).]

In the Assignment, "General Tire and its successors and

assigns covenanted that they would 'observe and perform all of

the covenants and agreements in said documents contained and on

the part of the Lessee to be paid, observed and

performed . . . .'" [Wond Family's Count IV CSOF at ¶ 7;

Continental's Responsive Count IV CSOF at § I (admitting Wond

Family's ¶ 7).] In 1984, General Tire – which at the was named

GenCorp, Inc. – assigned its interest in the Sublease to General

Tire, Inc.[7] Kapalama Associates LLC ("Kapalama Associates")[8]

purchased Clarke Investment's interest in the Lease on

November 8, 2000 in bankruptcy proceedings, and Kapalama

---

[6] (...continued)
on December 28, 2016 ("Answer"), filed 1/30/17 (dkt. no. 10), at
¶ 13.]

[7] General Tire, Inc. was sold to Continental AG in 1987, but
it did not change its name until 1994, when it became Continental
General Tire, Inc. It later went through two name changes,
eventually becoming Continental Tire the Americas, LLC. [Wond
Family's Count IV CSOF, Decl. of Elijah Yip ("Yip Count IV
Decl."), Exh. 53 (excerpts of Continental's Objections &
Responses to Pltf.'s First Request for Answers to Interrogs. to
Def.) at 6-7.]

[8] Wond and Harriet Wond Little formed Kapalama Associates
when Clarke filed bankruptcy in 2000, and Wond was a co-manager
of Kapalama Associates. [Wond Decl. at ¶¶ 16, 18, Exhs. 12
(Articles of Organization).]

Associates transferred all of its assets to Wond Family in 2012. The Lease and the Sublease expired on October 31, 2012. [Wond Family's Count IV CSOF at ¶¶ 8-11; Continental Tire's Responsive Count IV CSOF at § I (admitting Wond Family's ¶¶ 8-11).] Continental Tire vacated the Property when the Sublease expired. [Continental's Count IV CSOF at ¶ 6; Wond Family's Responsive Count IV CSOF at ¶ 6 (only contesting other portions of Continental's ¶ 6).] Continental Tire does not currently own or operate a facility on the Property. [Continental's Count IV CSOF at ¶ 12; Wond Family's Responsive Count IV CSOF at § I (admitting Continental's ¶ 12).] During the term of the Lease and Sublease, Wond Family, the individual Wond family members, the Wond Family Trust, and Kapalama Associates did not have access to the Property. [Pltf.'s Separate & Concise Statement of Material Facts in Supp. of Wond Family's Counts I-III ("Wond Family's Counts I-III CSOF"), filed 10/6/17 (dkt. no. 65), Decl. of Michael M. Wond, Jr. ("Wond Counts I-III Decl.") at ¶ 26.]

## II. <u>Use of the Property</u>

Wond Family states that, on or before 1955, Melim was operating a tire recapping and automotive service business on the Adjoining Property. [Mem. in Supp. of Wond Family's Count IV Motion at 5 (citing Wond Family's Count IV CSOF, Decl. of Dan Ford ("Ford Count IV Decl."), Exh. 24 (excerpt of Expert Report dated 9/11/17 by Ford Canty & Associates, Inc. ("Ford Report")),

App'x B-1).[9]] According to Wond Family, sometime after Melim entered into the Sublease, it began using both the Property and the Adjoining Property to operate its business. [Wond Count IV Decl. at ¶ 24.] However, Continental Tire presents evidence that the Property was used primarily as a parking lot for the tire business – which was operated on the Adjoining Property – until approximately 1992 or early 1993. [Concise Statement of Facts in Supp. of Continental's Counts I-III Motion ("Continental's Counts I-III CSOF"), filed 10/6/17 (dkt. no. 57), Decl. of Lindsay Friedman ("Friedman Decl.") at ¶ 3.[10]]

In 1968, Melim sold its business to General Tire, and the business was renamed "Melim General Tire Service." [Ford Report, App'x D (various newspaper advertisements and articles) at 1-4.] From 1968 to 1993, General Tire and its successors used both properties to operate a tire sales and recapping/automotive services business.[11] Either Continental Tire or its predecessors

_____

[9] Dan Ford is a Registered Professional Geologist. He is the co-founder and Principal Geologist of Ford Canty & Associates, Inc. [Ford Count IV Decl. at ¶ 1.] Appendix B-1 is a 1955 Sanborn Fire Insurance Map; it does not describe the nature of Melim's business in 1955. However, the parties do not dispute that Melim was operating a tire recapping and automotive service business.

[10] Lindsay Friedman is Continental Tire's Senior Manager for corporate real estate. [Friedman Decl. at ¶ 1.]

[11] "Tire recapping is the process by which the tread on used tires is removed and replaced with fresh rubber, and it can be performed on both personal and large commercial vehicle tires."

(continued...)

had possession and control of the Property from September 24, 1968 until at least October 31, 2012.  [Wond Count IV Decl. at ¶¶ 25, 27.]

Melim used a building, which it constructed, on the Adjoining Property to operate its business ("Service Station A").[12]  Service Station A "was expanded such that part of its footprint was on the Property," but it was demolished in the 1990s.  [Id. at ¶ 26.]  A 1968 Honolulu Star-Bulletin article stated Melim's "Waiakamilo Road plant . . . has 35,000 square feet under roof."  [Ford Report, App'x D at 1-2.]  Service Station A had seven underground hydraulic lifts, which crossed onto the Property.  When the lifts were removed in 1995, hydrocarbon impacted soil was found underneath, prompting a removal action.  [Wond Family's Counts I-III CSOF, Decl. of Elijah Yip ("Yip Counts I-III Decl."), Exh. 69 (Site Assessment and PCS Removal Action Former General Tire Location, dated 6/26/02, revised 1/30/04, by Hawai`i International Environmental Services, Inc. ("HIES Report")) at 1-2 & Figure 6).]  The hydraulic lifts "were likely used for various automotive services, including tire changing, and related vehicle repair and maintenance activities."  [Ford Report at 5.]

_____

[11] (...continued)
[Ford Report at 4.]

[12] Service Station A is shown on the maps attached to the Ford Report as Appendices B-2 and B-5 through B-8.

In or around 1983, Continental Tire built an automotive services building on the Property ("Service Station B").  It was demolished in 2012.  [Wond Count IV Decl. at ¶ 29.]  General Tire's Building Permit Application, approved on January 24, 1983, describes the work as a "NEW REPAIR AREA."  [Yip Count IV Decl., Exh. 52 ("1/24/83 Building Permit").]  Based on building permits and the drawings attached thereto, Service Station B had three service bays and three hydraulic lifts.  [Yip Counts I-III Decl., Exh. 72 at 1-2, Exh. 73 at 1; Ford Report at 6.]  There was also an oil/water separator ("OWS") system adjacent to Service Station B.  [HIES Report at CTA-000246; Ford Report, Figure 4.]  The OWS and drain system serviced the facilities on both properties, collectively.  [Ford Report at 6.]  The OWS drains and pipes delivered wastewater into a concrete box adjacent to Service Station B.  [Id.; 1/24/83 Building Permit.]  At the southern end of Service Station A, on the border between the Property and the Adjoining Property, there was a 250-gallon boiler fuel underground storage tank ("UST").  [Ford Report at 5 & Figure 4.]  It was installed in 1966, and "USTs installed during this time period did not have stringent designs or leak detection systems, and releases were common."  [Id. at 5.]

> As part of this system, floor drains were installed lengthwise along the edge of the roof overhang of Service Station A on [the Adjoining Property], and the bay opening of Service Station B on the [Property].  The purpose of these floor drains is to collect oily wastewater from

daily operations.  Both floor drains were outdoors
(not contained within the buildings) and exposed
to open air.  The floor drains emptied into 3-inch
cast iron piping, which extended parallel to the
floor drains and delivered wastewater to the OWS
system located in a concrete box adjacent to
Service Station B. . . .  There was a 100-gallon
waste oil UST located adjacent to the OWS, which
collected the oil for eventual disposal. . . .

. . . .

Construction drawings also indicate that following
closure of the boiler UST in 1988, it was replaced
by a boiler fuel above-ground storage tank (AST).
The AST was located in the southern corner of the
site, as shown approximately on Figure 4.  In
photographs of the site, an additional floor drain
was noted adjacent to the boiler AST, which
extended north towards the service stations.  It
is suspected to have merged with the OWS system.

[Id. at 6.]

As of October 1, 1968, Melim was a General Tire general

distributor, and its tire recapping work included "giant aircraft

and plantation-type tires."  [Id., App'x D at 1-2.]  According to

a 1970 advertisement, after acquiring Melim, Continental Tire's

predecessor continued to replace tires for passenger vehicles, as

well as farm and industrial vehicles, and to perform tire

recapping.  [Id. at 7-8.]  During the years of its operation, the

business's services also included, *inter alia*: oil and oil filter

changes; transmission services; battery sale and servicing;

radiator flushing and filling; selling antifreeze coolant; and

various brake services.  [Ford Report, App'x D (various

advertisements).]

Continental General Tire, Inc. and Oahu Construction Company, Ltd. ("Oahu Construction") entered into a License Agreement dated January 31, 1997, allowing Oahu Construction to use the Property "from February 1, 1997 through May 31, 1997 for the staging of materials and equipment during construction and installation of water lines along Dillingham Boulevard." [Yip Counts I-III Decl., Exh. 66 (License Agreement) at 1.] The Ford Report states:

> Photographs of the site during this time period show large stockpiles of soil on the site. The source of the stockpiles is unknown. Vegetation was observed growing from the soil, indicating that piles had been there for some time. Because the source of the fill material is unknown test results are not available, there is potential that the fill material could have contributed to the contamination at the site.

[Ford Report at 7 & App'x E at 39-41 of 63 (dkt. no. 65-49).[13]]

The June 26, 2002 HIES Report, revised January 30, 2004, states: "The majority of the Site is currently being used as an unpaved gravel parking lot. A very small portion of the parcel is used as a staging area by a construction company, Okada Trucking. Okada Trucking occupies all of the adjacent parcel north of the Site." [HIES Report at pg. 1-2.]

---

[13] The photographs are labeled "1990s (Following Demolition of Service Station A)."

## III. **Contamination Issues**

Wond Family represents that, in 2011, it began to evaluate the environmental condition of the Property in anticipation of the expiration of the Lease and Sublease. [Mem. in Supp. of Wond Family's Count IV Motion at 9.] Wond commissioned a Phase I environmental site assessment ("ESA") report by Bureau Veritas North America, Inc. ("Bureau Veritas") regarding the Kapalama properties owned by Kapalama Associates, including the Property ("Phase I Report"). [Ford Count IV Decl., Exh. 25 (Phase I Report, dated August 12, 2011).] Wond Family argues the Phase I Report: "identified several recognized environmental conditions including lack of documentation regarding remedial work after a petroleum release was discovered on the Property, and the likelihood of contamination from prior automotive repair and services conducted on the premises"; and it recommended a Phase II ESA for the Property. [Mem. in Supp. of Wond Family's Counts I-III Motions at 13-14 (citing Phase I Report at 37-38).] After Continental Tire refused Wond's request for access, Wond Family had its attorney – Philip Leas, Esq. – contact Continental Tire's in-house counsel – Kevin Collins, Esq. – in a February 23, 2012 letter. Mr. Leas stated that: page 7, section 13 of the Sublease required Continental Tire to permit Kapalama Associates and its agents to enter the Property to examine its condition; Kapalama Associates invoked that clause to

14

perform a Phase II investigation; Kapalama Associates intended to conduct the investigation at its own expense to see if any remediation was necessary. [Wond Family's Count IV CSOF, Decl. of Philip J. Leas ("Leas Count IV Decl."), Exh. 26 (2/23/12 letter) at 1.] Mr. Leas emphasized that Kapalama Associates and Wond Family expected Continental Tire would return the Property in good condition at the end of the Sublease. This included the removal of a derelict structure on the Property, *i.e.*, "[t]he ultimate condition of property should be a paved lot free of debris." [Id. at 2.] Wond Family asserts the derelict structure Mr. Leas was referring to was Service Station B. [Mem. in Supp. of Wond Family's Count IV Motion at 10.]

After various disputes with Kapalama Associates, Continental Tire had the structure removed, but, according to Kapalama Associates, "it broke off from an underground pipe that seemed to be directed toward a concrete patch in the pavement that may be the site of an underground tank." [Leas Count IV Decl., Exh. 30 (email chain between Leas and Collins from 5/22/12 to 7/20/12) at P000030.] Mr. Leas stated the remaining pipe was an environmental concern. [Id.] Further, the removal resulted in "a large depression about two feet deep below the natural grade of the property," and Kapalama Associates required that the Property be restored to grade before the end of the Sublease. [Leas Count IV Decl., Exh. 32 (email chain between Leas and

Collins from 5/22/12 to 10/10/12) at P000095.] Mr. Collins asserted the Property was in sufficiently restored condition, and any depression was imperceptible. [Id.]

On October 15, 2012, Mr. Leas sent Mr. Collins an email with photographs showing the hole in the ground, and he argued that the hole was "much more than imperceptible." [Leas Count IV Decl., Exh. 33 at P000079.] On October 30, 2012, Mr. Collins advised him the hole had been filled in. [Id., Exh. 34 (email chain from 10/30/12 to 12/6/12) at P000091.]

From September 14 to 18, 2012 and on November 8, 2012, ENPRO Environmental ("ENPRO") conducted Phase II sampling and analysis on the Property on Continental Tire's behalf.[14] ENPRO's soil and groundwater sampling detected benzo(a)pyrene and lead levels in excess of HDOH's Tier 1 Environmental Action Levels for commercial/industrial use ("Tier 1 C/I EALs"). [Wond Family's Count IV CSOF at ¶¶ 29, 31; Continental Tire's Responsive Count IV CSOF at § I (admitting Wond Family's ¶¶ 29, 31).] "ENPRO recommended excavating the near surface soil in the immediate vicinity of the locations where sampling detected contamination above Tier 1 C/I EALs." [Wond Family's Count IV CSOF at ¶ 31; Continental Tire's Responsive Count IV CSOF at

---

[14] The report's description of the sampling areas does not explain why those areas were chosen for sampling. [Leas Count IV Decl., Exh. 47 at pgs. 4 of 38 to 38 of 38 (ENPRO Soil & Groundwater Sampling & Analysis, dated 12/11/12 ("Phase II Report")) at 1, 10-11.]

§ I.]  ENPRO's Phase II Report states no contaminants beyond the

Tier 1 C/I EALs were found in the samples collected in November

2012.  [Phase II Report at 2.]  ENPRO opined that

> the near surface soil contaminants previously
> identified at concentrations greater than the DOH
> Tier [C/I] 1 EALs were isolated to those original
> locations at Borings 4, 5, and 6.  Furthermore,
> groundwater contaminants previously identified at
> concentrations greater than the DOH Tier 1 [C/I]
> EALs were due to suspended solids because their
> presence was not confirmed when the sample was
> filtered and analyzed for dissolved contaminants.
>
> ENPRO recommends excavating the near surface
> soil in the immediate vicinity of the sample
> locations at Borings 4, 5, and 6 where
> contaminants were detected at concentrations
> greater than DOH Tier 1 [C/I] EALs.  Excavated
> contaminated soil should be disposed of at a
> certified on-island landfill and may require
> additional characterization, including toxicity
> characteristic leaching procedure (TCLP) analysis
> for lead, in order to meet the landfill acceptance
> criteria.

[Id.]

Mr. Leas received ENPRO's Phase II report on

December 22, 2012.  [Leas Count IV Decl., Exh. 47 at P000103-0

(email chain, with attachment, between Leas, Leas's assistant,

and Collins from 12/19/12 to 12/22/12).]  Noting work for the

Phase II Report was done on the Property after the expiration of

the Sublease, Mr. Leas informed Mr. Collins that Kapalama

Associates intended to issue an invoice for carryover rent until

the Property was cleaned up and "in good repair, order and

condition," as required by the Sublease.  [Id., Exh. 36 (letter

dated 1/3/13).]  In addition, Wond Family retained Bureau Veritas
to review ENPRO's work.  Bureau Veritas prepared a letter, dated
February 20, 2013, to Wond, summarizing the Phase II Report and
identifying "a number of significant issues with ENPRO's
investigation methodology, the quality of documentation,
questions regarding sample integrity, the quality of
documentation and their conclusions" ("2/20/13 Bureau Veritas
Review Letter").  [Wond Family's Counts I-III CSOF, Decl. of
John P. Rau ("Rau Counts I-III Decl."), Exh. 28 at 2.[15]]  Two of
the fourteen issues identified in the 2/20/13 Bureau Veritas
Review Letter were: the lack of "rationale for the location of
boreholes and depths of sample location"; and improper comparison
to the HDOH Tier 1 C/I EALs.  [Id. at 3.]  Bureau Veritas
transmitted the 2/20/13 Bureau Veritas Review Letter to HEER.
[Rau Counts I-III Decl., Exh. 27 (letter dated 3/8/13).]

From February 13 to 21, 2013, ENPRO excavated "a
20-foot by 20-foot area impacted by benzo(a)pyrene and a 20-foot
by 40-foot area impacted by lead," each to a depth of two feet
below ground surface ("bgs").  [Leas Count IV Decl., Exh. 48
(excerpt of ENPRO Soil Removal & Disposal and Confirmation
Sampling & Analysis, dated 3/12/13 ("Phase III Report")) at 1.[16]]

---

[15] John Rau was formerly employed by Bureau Veritas as a
Senior Geologist.  [Rau Count I-III Decl. at ¶ 1.]

[16] Exhibit 48 also includes various emails between Mr. Leas
(continued...)

ENPRO subsequently performed field testing to analyze the effectiveness of the remediation activities. The testing of samples collected from the remediation areas did not identify Polynuclear Aromatic Hydrocarbons ("PAHs") or Total Lead at levels exceeding HDOH Tier 1 C/I EALs. [Id.] ENPRO's excavation uncovered "a concrete box, believed to be a former oil-water separator, with metal piping, a concrete slab beneath the oil-water separator, and surrounding pea gravel . . . in the 20-foot by 20-foot remediation area." [Id.] ENPRO removed the OWS, but "[t]he concrete slab and associated piping were left at the project site for future removal and disposal at the request of the client." [Id. at 12.] Continental Tire took the position that the Phase III Report showed no further action was necessary as to the contaminants at the Property, but Kapalama Associates asserted their expert's analysis showed further testing was necessary. [Leas Count IV Decl., Exh. 48 at P000174-76.] The Phase III Report was filed with HDOH, and Continental Tire anticipated that a No Further Action ("NFA") determination would be issued as to the Property. [Id. at P000174.]

---

On March 1, 2013, Bureau Veritas collected samples from the open excavations on the Property and completed analytical testing "to provide some preliminary data regarding the effectiveness of ENPRO Environmental's remedial action." [Wond Family's Counts I-III CSOF, Decl. of Philip J. Leas, ("Leas Counts I-III Decl."), Exh. 50 (email dated 3/12/13 to Collins from Leas forwarding 3/11/13 email from Rau transmitting table summarizing test results) at P000172.] Mr. Rau stated:

> Both samples reported total petroleum hydrocarbons (TPH)-residual range organics (RRO) and benzo(a)pyrene at concentrations that exceeded the Hawaii State Department of Health (DOH) Tier 1 Environmental Action Levels (EALs). In addition, Sample 13022-S1 reported polychlorinated biphenyls (PCBs) at concentrations that exceeded the DOH Tier 1 EALs.
>
> The analytical results indicate that concentrations of several constituents remain at levels that exceed the DOH Tier 1 EALs.

[Id.]

On September 23, 2013, HEER issued a letter to Continental Tire, stating:

> The Phase II investigation conducted by ENPRO has been determined to be deficient in many HDOH requirements and cannot be considered appropriate for characterizing the site or determining necessary remedial actions. Some but not all of the deficiencies can be found in Bureau Veritas's letter of February 20, 2013 attached. Therefore, the report is rejected as a Phase II site characterization based on numerous technical errors. HDOH requires a full site characterization of 1385 Colburn Street following the procedures detailed in the [HDOH Technical Guidance Manual ("TGM")].

> Due to the substantial amount of technical errors
> – including sampling and analytical errors, and
> lack of sufficient detail – the Phase II report is
> inadequate for determining additional remedial
> actions for the site and HDOH cannot accept the
> Phase III report or issue a determination of No
> Further Action for the soil removal action.

[Leas Count I-III Decl., Exh. 53 (9/23/13 letter to Ken Miller
from Jordan Nakayama, Project Manager, HEER) at P000356.]
Mr. Leas thereafter informed Continental Tire's counsel,
Lisa Bail, Esq., that $171,257.89 in carryover rent was due from
the expiration of the Sublease to October 2013 because
Continental Tire failed to complete the required remediation of
the Property.  [Leas Count IV Decl., Exh. 40 (letter dated
10/25/13) at 1-3.]  Ms. Bail responded that Continental Tire did
not owe carryover rent because there was no evidence of
contaminants that exceeded the Tier 1 C/I EALs.  [Id., Exh. 41
(letter dated 1/27/14).]

On January 27, 2014, Continental Tire's counsel
transmitted to Wond Family's counsel a draft Follow-Up Site
Investigation Work Plan, dated January 25, 2014 by Kevin S.
Kennedy Consulting, LLC ("Kennedy Consulting" and "the Work
Plan").  [Leas Counts I-III Decl., Exh. 55 (letter to Leas from
Bail transmitting the Work Plan).]  On February 3, 2014, Wond
Family's counsel sent Continental Tire's counsel an email
transmitting a letter of the same date to Wond by Bureau Veritas
commenting on the Work Plan ("2/3/14 Bureau Veritas Review

21

Letter"). [Id., Exh. 56.] The 2/3/14 Bureau Veritas Review Letter was submitted to HDOH. [Rau Counts I-III Decl. Decl., Exh. 29 (2/25/14 email to Nakayama from Rau).] One of the concerns raised in the 2/3/14 Bureau Veritas Review Letter was that:

> The Work Plan includes the establishment of only three [decision units ("DUs")] for the site. Three DUs are not an adequate number to reasonably assess the property based on the number of historical uses the property and known areas of contamination. Section 3.4 of the TGM states that "the appropriate type, size, shape and number of DUs for a given project is necessarily site-specific and must take into consideration the historical, current and future use of the site."
>
> The Work Plan discusses numerous historical uses that do not appear to have been considered during the design of the three DUs. Historical environmental uses include the following:
>
> - A boiler underground storage tank (UST). No documentation exists showing that the UST was removed and proper assessment of the excavation conducted.
>
> - Past release of hydraulic oil on the adjacent 505 Waiakamilo Road property.
>
> - The former Oil/Water Separator (OWS).
>
> - The drainage trenches, at least one of which remains at the site.
>
> - An aboveground storage tank (AST) that was formerly located on the southern corner of the Property.
>
> - The Open sided steel framed CMU storage and carport used by Dent Doctors Hawaii and Lex Brodie Tire.

The Work Plan divides the Site into a limited number of very large areas. These areas include potential "hotspot areas" that have a greater likelihood of contamination. Rather than separating these into separate decision units designed to assess individual areas of concern, the Work Plan groups them together.

Alternatively, the Work Plan does not separate an area that has a greater likelihood for no contamination. Specifically, the remedial excavation conducted by Hawaii International Environmental Services (HIES) in 2002 to address a release of hydraulic oil, occurred on a portion of TMK (1) 1-5-021: Parcel 004, but extended onto Parcel 024. Because the excavation was reportedly filled with "clean backfill", it would be reasonable to assess this area separately from the nonexcavated areas. By including this area of likely clean fill material into the DU, the overall results are likely to be skewed to lower average concentrations.

[Leas Counts I-III Decl., Exh. 56 at P000381.]

In March and April 2014, in a follow-up site investigation for Continental Tire, Kennedy Consulting collected soil samples from the Property and conducted a geophysical survey to locate buried structures. Kennedy Consulting removed the remnant pipes associated with the OWS on April 17, 2014 and, some time in either March or April 2014, Kennedy Consulting broke up and removed the concrete box and concrete slab that were part of the OWS. [Leas Count IV Decl., Exh. 49 (excerpt of Follow-Up Site Investigation Report by Kennedy Consulting, dated 5/20/14 ("Follow-Up Report")) at 17-18.] Kennedy Consulting found lead in excess of the Tier 1 C/I EAL, as well as levels exceeding the Tier 1 EALs for unrestricted land use for total petroleum

hydrocarbons ("TPH") Lube Oil, PCBs, benzo(a)pyrene, dibenzo(a,h)anthracene, benzo(b)flouranthene, lead, and mercury. [Follow-Up Report, Tables 5-8.[17]] The Follow-Up Report requested that HDOH issue a Conditional NFA determination that was dependent upon the issuance of an Environmental Hazzard Management Plan ("EHMP") for the Property. [Follow-Up Report at 55.] Mr. Leas states that, to his knowledge, neither Continental Tire nor Kennedy Consulting prepared or proposed an EHMP for the Property. [Leas Count IV Decl. at ¶ 27.]

In a June 3, 2014 letter to Continental Tire (through its counsel), Wond Family (through its counsel) "demand[ed] that Continental Tire remove the contamination on the property and refrain from trying to burden the property with future conditions or restraints that would not exist were the contamination not present" ("6/3/14 Demand Letter").[18] [Leas Counts I-III Decl., Exh. 59 at 2.]

Bureau Veritas sent HEER a letter dated June 4, 2014 reviewing the Follow-Up Report ("6/4/14 Bureau Veritas Review Letter"). [Rau Counts I-III Decl., Exh. 30 (letter to Nakayama

_____

[17] Wond Family notes the Ford Report states there is both lead and TPHs as oil range organics ("TPH-ORO") in amounts that exceed the Tier 1 C/I EALs. [Mem. in Supp. of Wond Family's Count IV Motion at 28 (citing Ford Report at 18-19, App'x F).]

[18] The 6/3/14 Demand Letter also asserted that "[s]urrender of the property will not be complete until Continental Tire removes the contamination and grades the surface." [Leas Counts I-III Decl., Exh. 59 at 2.]

from Rau and Ford).] Bureau Veritas raised concerns, including the Follow-Up Report's "minimal discussion of Defendant's long-term use of the Property as an automotive service and tire facility, [Kennedy Consulting]'s failure to identify surface sources of contamination that are typically present at automotive repair facilities, and the request for a Conditional NFA." [Mem. in Supp. of Wond Family's Count I-III Motion at 20 (citing Rau Decl., Exh. 30 at 1-4, 7).]

On July 21, 2014, HEER issued Continental Tire a letter stating HDOH did not concur with the request for a conditional NFA determination ("7/21/14 HEER Letter"). It advised Continental Tire the "issue may be revisited following the capping of the entire site, submittal, and the HDOH approval of the site-specific EHMP and or excavation to 2' bgs of soil from the decision units 1 & 2" – *i.e.*, the "Capping Remedy" and the "Excavation Remedy." [Leas Count IV Decl., Exh. 45 (7/21/14 HEER Letter) at 1.] Kennedy Consulting submitted the Revised Follow-Up Site Investigation Report, dated October 6, 2015 ("Revised Follow-Up Report"), to HDOH on November 6, 2015. On November 16, 2015, HEER accepted the revised version, authorized Continental Tire to proceed with the project, and directed Continental Tire to confer with Wond on how to proceed. [Leas Count IV Decl., Exh. 46 (letter to Ken Miller of Continental Tire from Paul Chong, Project Manager, HEER, dated 11/16/15 ("11/16/15 HEER

Letter")).]  Continental Tire asserts that, according to the
Revised Follow-Up Report, "[t]he remaining contaminant of concern
at the Property is lead, which is present at one to two feet
below the surface, at concentrations exceeding the DOH Tier 1
Commercial/Industrial EAL," and which "was 'most likely imported
with artificial fill material.'"  [Mem. in Supp. of Count V
Motion at 3 (citing Revised Follow-Up Report at xii).]

Bureau Veritas prepared a draft Remedial Alternatives
Analysis Report ("Draft RAA Report") for Wond Family and
submitted it to HDOH on or about December 23, 2015.  HDOH
provided comments on the Draft RAA Report on March 10, 2016, and
Bureau Veritas incorporated the comments in the final version of
the report ("Final RAA Report"), which was submitted to HDOH on
July 15, 2016.  [Wond Family's Count IV CSOF, Decl. of John P.
Rau ("Rau Count IV Decl.") at ¶ 9.]  Bureau Veritas analyzed four
alternatives: 1) no action; 2) the Capping Remedy; 3) the
Excavation Remedy; and 4) excavation to four feet bgs ("Deeper
Excavation Remedy").  [Rau Counts I-III Decl., Exh. 32 (Final RAA
Report) at 18-27.]  Bureau Veritas compared the four alternatives
and opined that the Excavation Remedy was the preferred
alternative.  [Id. at 27-30.]

After reviewing the Draft RAA Report, HEER determined
either the Capping Remedy or the Excavation Remedy would be
acceptable.  [Leas Count IV Decl., Exh. 50 (letter dated 3/10/16

from Paul Chong to Wond ("3/10/16 HEER Letter")).] Continental

Tire contends that, because HDOH's position was the same as it

was in the 7/21/14 HEER Letter, the RAA reports were not

necessary. [Mem. in Supp. of Continental's Counts I-III Motion

at 7.] Wond Family asserts that, after the Final RAA Report was

submitted to HDOH, Bureau Veritas "then engaged in public

outreach regarding [Wond Family's] intent to implement the

Excavation Remedy." [Mem. in Supp. of Wond Family's Counts I-III

Motion (citing Rau Counts I-III Decl., Exhs. 34-39).[19]]

From September 23 to 26, 2016, Bureau Veritas collected

soil samples from the upper two feet of soil throughout the

Property "[i]n order to characterize the soil on the Property for

potential Excavation and disposal at a landfill in connection

with" Wond Family's selected remedy. [Rau Counts I-III Decl. at

¶ 11.] Bureau Veritas established eight DUs throughout the

Property. [Id. & Exh. 33 (map of DUs).] The Ford Report

includes a discussion of data from Bureau Veritas's 2016 sampling

---

[19] Exhibit 34 is the legal notice of Proposed Remedial
Action, published in the Honolulu Star-Advertiser on
September 29, 2016. Exhibits 35 through 38 are letters, each
dated September 23, 2016, from Bureau Veritas to: Senator Donna
Mercado Kim; Jack Bennett, Senior Environmental Program Manager,
Kamehameha Schools; Representative Joey Manahan; and
Representative Karl Rhoads. Exhibit 39 is a letter dated
September 28, 2016 Marcia Nakama, manager of the Kalihi-Palama
Public Library transmitting materials to be made available for
public review.

conducted on the Property.[20]  [Ford Report at 18-19.]  Bureau

Veritas's sampling indicated that several contaminants were

present in the zero to two foot layer of the Property at levels

exceeding HDOH's Tier 1 EALs.  The levels of TPH-ORO, TPH as

diesel range organics ("TPH-DRO"), and lead were high enough to

also exceed the Tier 1 C/I EALs.  [Id. at 19.]  Further, the

level of lead in the two to four foot layer also exceeded the

Tier 1 EAL, and mercury impacted soil was found as deep as 11.0-

11.5 feet.  [Id. at 20.]  Wond Family contends the contaminants

remain on the Property to the current date.  [Count V Opp. at 7.]

The Ford Report opines "the most probable cause of contamination

at the site is related to historical use of the site as an

automobile repair facility."  [Ford Report at 21.]  In addition

to the general operation of the automotive facility, the Ford

Report noted:

> Based on aerial photographs of the site
> (particularly from 1967, Appendix B-3), it is
> evident that Continental Tire maintained poor
> housekeeping practices as [sic] the site.  The
> surface of the site consisted of exposed soil, and
> vehicles, equipment, large piles of used tires and
> debris were observed on the ground surface.
>
> This is indicative of improper storage and poor
> housekeeping at an automobile repair facility.
> Most likely, the debris at the site was derived
> from automobile service operations, and it could

---

[20] Appendix F to the Ford Report includes: a table titled
"Summary of Soil Analytical Results by Bureau Veritas"; and a
table titled "Comparison of Analytical Results from KSK and BVNA
Reports" (*i.e.*, Kennedy Consulting and Bureau Veritas).

have included batteries, drums, and used oil and
automobile fluids, which have the potential to
discharge contaminants to the ground surface.

Further evidence of poor housekeeping include
photographs of the site from the 1990s and 2000s
(refer to Appendix E). The photographs show
heavily stained areas of asphalt-pavement around
trench drains near the former AST, and at least
three 55-gallon drums without secondary
containment. Following closure of the service
stations, 55-gallon drums were still present at
the site, and batteries were observed on the
ground surface.

[Id. at 23.]

Wond Family asserts it has commenced the Excavation

Remedy process, but Continental Tire argues there is no evidence

Wond Family has done so.

**DISCUSSION**

The Court will address the parties' motions in the

order they were heard, or were scheduled to be heard.

I.   **The Parties' Count IV Motions**

Count IV alleges Continental Tire breached Covenants 9,

13, 18, and 19 of the Sublease.  [Complaint at ¶¶ 86-89.]  Wond

Family alleges:

Continental Tire's breaches of the Sublease have
caused Plaintiff to sustain damages including but
not limited to: costs to perform environmental
investigation that Continental Tire should have
completed prior to the expiration of the Sublease,
costs to remediate the contamination on the
Property, and lost rent during the period
following the expiration of the Sublease up until
the time the Property is restored to the condition
in which Continental Tire is obligated to return

the Property to Plaintiff pursuant to Covenants 9
and 19 of the Sublease.

[Id. at ¶ 91.]

Continental's Count IV Motion contends Continental Tire
is entitled to summary judgment on Count IV because Wond Family's
claim for holdover rent from the date the Sublease expired until
the Property is remediated fails as a matter of law because:
Continental Tire is not in possession of the Property; and there
is no provision in the Sublease allowing for the collection of
holdover rent.  Wond Family's Count IV Motion seeks partial
summary judgment on the following issues: 1) Continental Tire "is
liable for breach of the lease . . . by failing to uphold its
surrender obligations arising from the lease terms and common
law"; and 2) Wond Family "may recover carryover rent since
October 31, 2012 from Defendant as a remedy for its breach of its
surrender obligations."  [Mem. in Supp. of Wond Family's Count IV
Motion at 3.]  Wond Family's Count IV Motion does not seek a
ruling on the amount of carryover rent due.

The Sublease states:

AND THE SAID LESSEE hereby covenants and
agrees with the Lessor as follows:

. . . .

(9)  That the Lessee will not make or suffer
any waste or strip or unlawful, improper or
offensive use of said premises or any part
thereof; and will, during the whole of said term
keep the said premises, including improvements, in
a strictly clean, neat and sanitary condition; and

will also observe, comply with and perform all rules, regulations, ordinances and/or laws made by the Board of Health and/or other due authority of the municipal, territorial or federal governments applicable to the said premises and improvements, and will indemnify and hold harmless the Lessor and its successors against all actions, suits, damages and claims by whomsoever brought or made by the reason of the non-observance or non-performance of the said rules, regulations, ordinances and laws or of this covenant;

. . . .

(13) That the Lessee will permit such fee simple owner(s), the Lessor and their respective agents, at all reasonable times during the said term, to enter the premises and examine the state of repair and condition thereof, and will repair and make good all defects of which notice shall be given by the Lessor, or its agent, within thirty (30) days after the giving of such notice;

. . . .

(18) That the Lessee will not commit or suffer any act or neglect whereby the demised premises or any erection or improvement thereon or the estate of the Lessee in the same at any time during the said term shall become subject to any attachment, judgment, lien, charge, or encumbrance whatsoever except as hereinafter provided, and shall indemnify and hold harmless the Lessor against all liens, charges, and encumbrances and all expenses resulting therefrom, including attorneys' fees;

(19) That at the end of the said term, or other sooner determination of this lease, the Lessee will peaceably and quietly deliver up to the Lessor possession of the land hereby demised, together with all erections and improvements upon or belonging to the same, by whomsoever made, **in good repair, order and condition, reasonable wear and tear excepted.**

[Bail Count IV Decl., Exh. A (Sublease) at P001068, P001074-80 (emphasis added).]  Paragraph (19) is referred to as the "Surrender Clause."  It is undisputed that the Sublease does not expressly address the remedy of holdover rent – also referred to as carryover rent.

A.    **Availability of Holdover Rent**

The crux of Continental Tire's argument is that the adoption of Haw. Rev. Stat. § 521-71(e) in Hawaii's Residential Landlord-Tenant Code ("Chapter 521") indicates the Hawai`i State Legislature ("the Legislature") intended to displace any common law remedy of holdover rent.  Continental Tire therefore contends that, because there is no corresponding statute for commercial leases, holdover rent is no longer available for commercial leases, including the Sublease, unless the lease expressly provides for it.

To the extent Continental Tire contends Hawai`i law never recognized a common law right to holdover rent, Continental Tire's position is rejected.  In <u>Schimmelfennig v. Grove Farm Co.</u>, the Supreme Court of the Territory of Hawai`i stated:

> There is no dispute between the parties that, independently of express covenant, applicable provisions of law impose the obligation upon a lessee to restore the premises at the termination of a tenancy in substantially the same condition as at the inception of a lease, subject to reasonable use.  (<u>U.S. v. Jordan</u>, 186 F.[2d] 803; <u>Lane v. Spurgen</u>, 100 Cal. App. [2d] 460, 223 P.[[2d] 889; <u>Martin v. Medlin</u>, 81 Ga. App. 602, 59 S.E.[2d] 519; <u>Salina Coca-Cola Bottling Corp. v.</u>

> Rogers. 171 Kan. 688, 237 P.[2d] 218; Donsky v.
> Sedlak, 4 N.J. Misc. 49, 131 Atl. 619; Welch v.
> Rice, 61 Wyo. 511, 159 P.[2d] 180.)

41 Haw. 124, 129 (1955) (alterations in Schimmelfennig).

Further,

> "[w]hen the tenant, whose term has expired by
> efflux of time, instead of quitting the premises,
> as he ought to do, remains in possession, holding
> over as it is called, he is a wrongdoer, and may
> be treated as such by the owner, his landlord."
> (Den ex dem. Decker v. Adams, 12 N.J.L. 99, 100;
> Grant v. White, 42 Mo. 285; Leonard v. Spicer Mfg.
> Co., 103 N.J.L. 391, 139 Atl. 15.) In such
> circumstances, "he becomes a tenant at sufferance,
> and the landlord has the option to treat him as a
> tenant or proceed against him as a trespasser, or
> bring an action for unlawful detainer without
> service on the tenant of any prior notice, but if
> a new contract is shown either express or
> inferable from the dealings of the parties, the
> estate becomes one at will, and a new contract may
> be inferred from an agreement for a new lease."
> (3 Thompson, Real Property, § 1511, pp. 781-782
> [[1940]; Kaye v. M'Divani, 6 Cal. App. [2d] 132,
> 44 P.[2d] 371; Leggett v. Louisiana Purchase
> Exposition Co., 157 Mo. App. 108, 137 S.W. 893;
> National Bank v. People's Grocery Co., 153 S.C.
> 118, 150 S.E. 478; Monks v. Hess, 53 S.D. 275, 220
> N.W. 490.)

Id. at 134 (alterations in Schimmelfennig). In Smith v.

Bottomingly, the Supreme Court of the Territory stated:

> The duty of the lessee to so arrange his affairs
> during the term of the lease as to be able to
> surrender actual possession on or immediately
> after the last day of the lease is the same in all
> such cases. The duty is upon the lessee to
> ascertain, in ample time, whether a subtenant is
> setting up a spurious claim and to take such steps
> as may be necessary to restore the possession
> before the expiration of the lease, so that he may
> be able to deliver that possession to those
> entitled thereto at the end of the term.

The decision of the court in <u>Henderson v. Squire</u>, 4 L.R., Q.B. Cases, 170, 173, 174, a case of an implied covenant to restore possession, supports these views. Cockburn, C.J., said: "I am prepared to abide by the law as laid down by Lord Kenyon in <u>Harding v. Crethorn</u>, that 'when a lease is expired the tenant's responsibility is not at an end; for if the premises are in possession of an under-tenant, the landlord may refuse to accept the possession, and hold the original lessee liable; for the lessor is entitled to receive the absolute possession at the end of the term.' That has been considered law ever since, and has been recognized as law in all the text books.

30 Haw. 853, 856-57 (1929). Based on these cases, this Court concludes Hawai`i common law recognized a landlord's right to holdover rent.

In addition, in 1972, holdover rent was statutorily recognized by § 521-71(e), which states:

Whenever the term of the rental agreement expires, whether by passage of time, by mutual agreement, by the giving of notice as provided in subsection (a), (b), (c), or (d) or by the exercise by the landlord of a right to terminate given under this chapter, if the tenant continues in possession after the date of termination without the landlord's consent, the tenant may be liable to the landlord for a sum not to exceed twice the monthly rent under the previous rental agreement, computed and prorated on a daily basis, for each day the tenant remains in possession. The landlord may bring a summary proceeding for recovery of the possession of the dwelling unit at any time during the first sixty days of holdover. Should the landlord fail to commence summary possession proceedings within the first sixty days of the holdover, in the absence of a rental agreement, a month-to-month tenancy at the monthly rent stipulated in the previous rental agreement shall prevail beginning at the end of the first sixty days of holdover.

In 1972, the Legislature enacted Chapter 521. 1972 Haw. Sess. Laws Act 132, at 446-64. Continental Tire argues the legislative history of Act 132 shows the Legislature intended to supersede common law landlord-tenant law because the Legislature recognized it was outdated. Continental Tire argues § 521-71(e) only revives the right to holdover rent for residential leases and, because there is no corresponding statute reviving the right to holdover rent for commercial leases, the right no longer exists for commercial leases. This Court disagrees.

In considering a draft of the bill that eventually became Act 132, the Hawai`i Senate Committee on Consumer Protection stated: "The existing landlord-tenant law, based on out-dated English common law doctrines, is largely inappropriate to modern conditions and inexpressive of the vital interests of the parties and the public which the law must protect, as recognized and expounded in the <u>Lemle v. Breeden</u>[, 51 Haw. 426, 462 P.2d 470 (1969),] decision." S. Stand. Comm. Rep. No. 223-72, in Senate Journal at 834. The committee also stated the purpose of the bill was to "establish a new legal framework governing the relationships of **residential** landlords and tenants, consistent with" <u>Lemle</u>.[21] <u>Id.</u> at 832 (emphasis added). The committee opined that, if the bill as amended was enacted, "it

---

[21] <u>Lemle</u> involved the lease of a residence. 51 Haw. at 426-27, 462 P.2d at 471.

35

could provide the basis for the law of **residential** landlord and tenant to be developed by the courts in the realistic light of modern concepts and modern living conditions." Id. at 834 (emphasis added). Similarly, the Conference Committed stated:

> The purpose of this bill is to establish a comprehensive residential landlord-tenant code under which **the law governing residential landlord and tenant relations would be restated in a manner consistent with recent court decisions**, with the residential rental market, and with the objective of improving such landlord and tenant relations. The code would spell out in some detail the respective rights, obligations, and remedies of **residential** landlords and tenants.
>
> The proposed codification of this fundamental area of the law must be undertaken with great care, for the code is intended to be comprehensive and to serve as the basis for future law that will be developed by the courts. . . .

Conf. Comm. Rep. No. 12-72, in 1972 Senate Journal, at 756, 1972 House Journal at 1054 (emphases added); see also id. S. Stand. Comm. Rep. No. 477-72, in 1972 Senate Journal, at 948; H. Stand. Comm. Rep. No. 659-72, in 1972 House Journal, at 961 (reports from Senate Judiciary Committee and House Judiciary Committee, both including the same text as the first sentence of Conf. Comm. Rep 12-72). Nothing in either Act 132 or its legislative history suggests the Legislature intended to replace landlord-tenant law in any areas other than the residential context.

Chapter 521 itself expressly states one of its purposes is "[t]o revise the law of **residential** landlord and tenant by

changing the relationship from one based on the law of conveyance to a relationship that is primarily contractual in nature." Haw. Rev. Stat. § 521-2(b)(3) (emphasis added). As to Chapter 521's effect on the applicability of other authority, Haw. Rev. Stat. § 521-3 states, in pertinent part:

> (a) Unless displaced by the particular provisions of this chapter, the principles of law and equity, including the law relative to capacity to contract, principal and agent, real property, public health, safety and fire prevention, estoppel, fraud, misrepresentation, duress, coercion, mistake, bankruptcy, or other validating or invalidating cause supplement its provisions.
>
> (b) Every legal right, remedy, and obligation arising out of a rental agreement not provided for in this chapter shall be regulated and determined under chapter 666, and in the case of conflict between any provision of this chapter and a provision of chapter 666, this chapter shall control.

Thus, Chapter 521 only applies to residential landlord-tenant relationships, and it only displaces the common law regarding residential leases. Because Chapter 521 does not displace the common law regarding commercial leases, a statute expressly allowing commercial landlords to recover holdover rent is not necessary. Further, because the common law right to holdover rent in commercial leases remains in effect, a commercial landlord may recover holdover rent even in the absence of an express contractual provision authorizing the remedy. Insofar as Wond Family's Count IV Motion seeks a ruling that holdover rent is an available remedy, its motion is granted. Because

Continental's Count IV Motion seeks a ruling that holdover rent is not available in Hawai`i for commercial leases, this motion is denied.

B.  **Scope of Continental Tire's Obligations**

Wond Family's Count IV Motion seeks a ruling that, under the Surrender Clause and Hawai`i common law, Continental Tire was obligated to surrender the Property at the end of the Sublease in substantially the same condition it was when the Sublease commenced, subject to reasonable use.  The Surrender Clause required the Lessee to return the Property to the Lessor "together with all erections and improvements upon or belonging to the same, **by whomsoever made**, in good repair, order and condition, reasonable wear and tear excepted." [Bail Count IV Decl., Exh. A (Sublease) at P001080 (emphasis added).]  The Assignment states:

> in consideration of the premises, the Assignee, for itself, its successors and assigns, hereby covenants with (1) the Assignor and (2) the Lessors, and their respective successors, successors in trust and assigns: that the Assignee will pay the rents reserved by said Leases, and will observe and perform **all of the covenants and agreements** in said documents contained and on the part of the Lessee to be paid, observed and performed, and will indemnify and keep the Assignor and the Lessors indemnified against all claims, demands, damages, costs, counsel fees and expenses by reason of any breach of these covenants.

[Id., Exh. B (Assignment) at 4 (emphasis added, other emphases omitted).] Based on the evidence described *supra*, this Court finds that: 1) Continental Tire is a successor of the Assignee – General Tire; and 2) Wond Family is a successor and/or assignee of the Lessor – Clarke Investment. Thus, under the Assignment, Continental Tire is obligated to perform all covenants and agreements in the Sublease – including the Surrender Clause, and Wond Family is entitled to enforce those obligations. There is no evidence in the record suggesting there is any other agreement limiting Continental Tire's obligations regarding the Property and the Sublease.

There are no genuine issues of material fact, and this Court concludes that, as a matter of law, Continental Tire assumed all of the lessee's obligations in the Sublease – including the Surrender Clause – when Continental Tire entered into the Assignment.[22]  See Fed. R. Civ. P. 56(a) ("The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."). Wond Family's Count IV Motion is granted insofar as it seeks a ruling that

---

[22] Because this Court concludes Continental Tire was obligated to comply with the Surrender Clause, it does not reach Wond Family's alternate argument regarding Continental Tire's surrender obligations under Hawai`i common law.

Continental Tire is obligated to perform all obligations under the Sublease – including the Surrender Clause.

### C. <u>**Whether Wond Family is Entitled to Holdover Rent**</u>

Wond Family's Count IV Motion also seeks a ruling that Wond Family is entitled to holdover rent because Continental Tire breached its surrender obligations. Viewing the current record in the light most favorable to Continental Tire as the non-moving party,[23] this Court concludes a reasonable jury could find for Continental Tire on the issues of: whether Continental Tire's environmental investigation and remediation efforts after the Sublease expired violated the Surrender Clause; and whether the condition of the Property at the time the Sublease expired constituted "good repair, order and condition, reasonable wear and tear excepted." <u>See</u> <u>California v. Campbell</u>, 319 F.3d 1161, 1166 (9th Cir. 2003) ("A genuine dispute arises if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."). Thus, there are genuine issues of material fact that preclude a summary judgment ruling that Continental Tire is a holdover lessee. Wond Family's Count IV Motion is

---

[23] "We review a grant of summary judgment de novo and must determine, viewing the facts in the light most favorable to the nonmoving party, whether there are any genuine issues of material fact." <u>Crowley v. Bannister</u>, 734 F.3d 967, 976 (9th Cir. 2013) (citations and quotation marks omitted).

therefore denied as to Wond Family's request for a ruling that
Continental Tire is a holdover lessee.[24]

## II. **Count V**

Count V alleges HEER has required Wond Family to
remediate hazardous substances that Continental Tire and its
predecessors released on the Property. [Complaint at ¶¶ 92-96.]
Continental Tire seeks summary judgment on Count V to the extent
Wond Family seeks indemnification for contamination occurring
before Continental Tire leased the Property. Continental Tire
contends that, because Covenant (9) of the Sublease does not
refer to either CERCLA or the environmental problems with the
Property before the Sublease was assigned to Continental Tire,
Covenant (9) does not require Continental Tire to indemnify Wond
Family for contamination Continental Tire did not cause.
[Continental's Count V Reply at 2.]

### A. **Indemnification for Post-Assignment CERCLA Violations**

CERCLA was enacted in 1980. See 94 Stat. 2796. Thus,
neither the Sublease nor the Assignment refer to it. However,
Covenant (9) of the Sublease requires the sublessee to "observe,

_____

[24] Because this Court cannot rule, as a matter of law, that
Continental Tire is a holdover lessee, it does not address for
what period Wond Family may recover holdover rent or whether Wond
Family mitigated its damages. However, even if this Court
concluded, as a matter of law, that Continental Tire is a
holdover lessee, it would find there are genuine issues of
material fact as to the period of recovery and the mitigation of
damages.

comply with and perform **all** rules, regulations, ordinances and/or laws made by the . . . federal governments applicable to the said premises and improvements." [Sublease at P001074 (emphasis added).] This language is broad enough to include federal laws that were not in effect at the time of the Sublease, but were enacted after the Sublease, such as CERCLA. Further, Covenant (9) requires the sublessee to "indemnify and hold harmless the Lessor and its successors against all actions, suits, damages and claims by whomsoever brought or made by the reason of the non-observance or non-performance of the said rules, regulations, ordinances and laws." [Id.] This Court has concluded the Assignment obligates Continental Tire to comply with all of the sublessee's covenants and agreements in the Sublease, and Wond Family is entitled to enforce those obligations. In addition to the indemnification obligations assumed in the Sublease, the Assignment also contains its own indemnification language: "the Assignee . . . will indemnify and keep the Assignor and the Lessors indemnified against all claims, demands, damages, costs, counsel fees and expenses by reason of any breach of these covenants." [Assignment at 4.] Although the issue is not squarely presented in Continental's Count V Motion, this Court is inclined to conclude the indemnification language in the Sublease and the indemnification language in the Assignment are sufficiently broad enough to require Continental

Tire to indemnify Wond Family for CERCLA claims based on post-Assignment violations by General Tire and its successors/assigns, including Continental Tire.

**B.    Indemnification for Pre-Assignment CERCLA Violations**

At issue in Continental's Count V Motion is whether Continental Tire is liable for any CERCLA violations that occurred prior to the Assignment.   Continental Tire's position is that lead is the only contaminant of concern on the Property, and the Revised Follow-Up Report indicates the contamination is most likely from imported, artificial fill.   However, Continental Tire argues Wond Family has neither alleged nor presented evidence establishing that Continental Tire brought the contaminated fill to the Property, and Wond Family has acknowledged that multiple entities brought fill to the Property.   In discovery, Wond Family stated:

> 5.    IDENTIFY all parties who brought fill onto the PROPERTY, and describe the type of fill, where it was placed and when it was placed.
>
> Response:
>
> In or around 1956, Hawaiian Dredging stockpiled clean coral fill material on the Property for application to low lying areas on properties in the Kapalama area owned by the Wond family, including the Property. Melim and Defendant also placed fill on the Property.[25]

---

[25] The Court will refer to this as "Answer to Interrogatory 5."

[Bail Count V Decl., Exh. K (Pltf.'s Response to Def. Continental
Tire the Americas, LLC's First Request for Answers to Interrogs.
to Pltf. Wond Family Kapalama, LLC dated 4/19/17) at 6 (emphases
in original).]  Continental Tire contends it is entitled to
summary judgment as to the portion of Count V seeking
indemnification for contamination occurring on the Property prior
to the Assignment because Wond Family cannot show who caused the
contamination.

          This Court must first determine whether imposing pre-
Assignment liability on Continental Tire is possible under the
terms of the Sublease and the Assignment.  Under Hawai`i law, in
order to assume liability for past breaches, an indemnity
agreement must "'clearly and unequivocally' assume either general
environmental liability or the indemnitee's . . . past breaches."
Servco Pac. Inc. v. Dods, 193 F. Supp. 2d 1183, 1193 (D. Hawai`i
2002) (citing Kamali v. Hawaiian Electric Co., 54 Haw. 153, 162,
504 P.2d 861, 866 (1972)).  As previously noted, neither the
Sublease nor the Assignment refers to CERCLA.  Further, the
Sublease and the Assignment do not refer to liability for:
1) general environmental laws in existence at the time of the
document; 2) general environmental laws that may be enacted after
the execution of the document; or 3) violations that occurred
before the parties executed the documents.  Thus, neither the
Sublease, the Assignment, nor the two documents read collectively

clearly and unequivocally assumes liability for environmental claims based on the lessor's past breaches or liability for the lessor's past breaches of statutory schemes that may be enacted in the future.

However, the broad language in the Sublease's and the Assignment's indemnity provisions may be construed to assume such liability if there is evidence that Melim had knowledge of environmental problems when it entered into the Sublease and/or that General Tire had such knowledge when it entered into the Assignment. See Purolator Products Corp. v. Allied-Signal, Inc., 772 F. Supp. 124, 137 (W.D.N.Y. 1991) ("Facet knew that there were problems at the site when it entered into the October 1979 indemnity agreement. By agreeing to a broad, inclusive assumption of liability with respect to the transferred property at a time when the environmental problems were not fully resolved, Facet assumed environmental liability for the site.").

Viewing the record in the light most favorable to Wond Family, this Court finds there are genuine issues of material fact regarding whether Melim had knowledge of past or existing environmental problems when it entered into the Sublease and whether General Tire had knowledge of past or existing environmental problems when it entered into the Assignment. Unless there was such knowledge, the broad indemnity language in the Sublease and/or the Assignment does not constitute an

assumption of liability for environmental problems that had

occurred or were in existence when the Sublease and/or the

Assignment were executed.  These issues of fact preclude a

summary judgment ruling on the issue of whether Continental Tire

is liable for contamination that occurred on the Property prior

to the Assignment.

Because this Court cannot conclude, based on the

current record, whether or not the Sublease and the Assignment

allow Continental Tire to be held liable for any contamination

that occurred prior to the Assignment, this Court declines to

address whether and, if so, when and how any pre-Assignment

contamination occurred.  Continental's Count V Motion is denied.

**III   The Parties' Counts I-III Motions**

Continental Tire seeks summary judgment as to Counts I,

II, and III because Wond Family cannot prove that: it has

incurred environmental response or recovery costs; it complied

with CERCLA's and HERL's requirements; or that Continental Tire

is a potentially responsible party ("PRP").  Wond Family seeks

summary judgment on Counts I, II, III as to liability and does

not seek a ruling on damages.  Further, Wond Family asserts this

Court does not need to determine what contamination on the

Property is attributable to Continental Tire's activities because

CERCLA and HERL are strict liability schemes, and Continental

Tire is jointly and severally liable for the entire harm to the

Property.  If there are other users of the Property that are
responsible for the contamination, Continental Tire must
establish that fact at the contribution stage, not the liability
stage.

> CERCLA, 42 U.S.C. §§ 9601-9675, is a statutory
> scheme giving the federal government broad
> authority to require responsible parties to clean
> up contaminated soil and groundwater.  Key Tronic
> Corp. v. United States, 511 U.S. 809, 814, 114 S.
> Ct. 1960, 128 L. Ed. 2d 797 (1994).
> Section 9607(a) states that any enumerated
> responsible party, including any person who is a
> current owner or operator of contaminated
> property, is liable for "any . . . necessary costs
> of response incurred by any other person
> consistent with the national contingency plan."
> 42 U.S.C. § 9607(a)(B).  "Response" costs are
> limited to cleanup, enforcement, and related
> security costs.  42 U.S.C. § 9601(23)-(25).  The
> national contingency plan (NCP) is a national plan
> promulgated by the federal government to guide
> federal and state response actions.  42 U.S.C.
> § 9605; 40 C.F.R. pt. 300 (publishing the NCP).  A
> private person (someone who is not the United
> States, a state, or a tribe) who has incurred
> "necessary costs of response" that are consistent
> with the NCP, 42 U.S.C. § 9607(a)(B), may bring an
> action to recover such costs, including "interest
> on the amounts recoverable."  § 9607(a).

AmeriPride Servs. Inc. v. Texas E. Overseas Inc., 782 F.3d 474,
479-80 (9th Cir. 2015) (alteration in AmeriPride) (footnote
omitted).

> Under § 9607(a)(A)-(D), a potentially
> responsible party is liable for specified costs
> incurred by a government, including natural
> resource damages and certain health effects
> studies, and for "necessary costs of response
> incurred by [a private party] consistent with the
> national contingency plan."  Section 9607(a)
> further provides that "[t]he amounts recoverable

in an action under this section shall include
interest on the amounts recoverable" under
§ 9607(a)(A)-(D), and "[s]uch interest shall
accrue from the later of (i) the date payment of a
specified amount is demanded in writing, or
(ii) the date of the expenditure concerned."
§ 9607(a).

To prevail in a private cost recovery action
under § 9607(a), a plaintiff must establish, among
other things, that the release of a hazardous
substance "caused the plaintiff to incur response
costs that were 'necessary' and 'consistent with
the national contingency plan.'" Carson Harbor
[Vill., Ltd. v. Unocal Corp.], 270 F.3d [863,]
870-71 [(9th Cir. 2001).] Therefore, a defendant
liable in a private cost recovery action under §
9607(a) would be liable for response costs that
meet such criteria.

A party liable under § 9607(a) may bring a
contribution action under § 9613(f)(1), which
permits courts to allocate "response costs" among
liable parties. Such a plaintiff may seek
contribution "from any other person who is liable
or potentially liable" under § 9607(a). The
liability of the defendant in the contribution
action is therefore also defined by § 9607(a).

Reading these sections together, when a
private plaintiff who incurred liability under
§ 9607(a)(B) for a third party's response costs
seeks contribution under § 9613(f)(1) for such
costs, the only response costs recoverable from
the defendant in the contribution action are those
that were necessary and consistent with the
NCP. . . .

Id. at 489-90 (some alterations in AmeriPride). "'Private party

remedial action is "consistent with the [NCP] if the action, when

evaluated as a whole, is in **substantial compliance** with . . .

[certain procedural requirements], and results in a

CERCLA-quality cleanup."'" Chubb Custom Ins. Co. v. Space

Sys./Loral, Inc., 710 F.3d 946, 961 (9th Cir. 2013) (alterations and emphasis in Chubb Custom) (quoting Carson Harbor Vill. v. Cty. of Los Angeles, 433 F.3d 1260, 1265 (9th Cir. 2006) (quoting 40 C.F.R. § 300.700(c)(3)(i))).

The elements of a contribution/indemnity claim under CERCLA and HERL are essentially the same. "HERL, like CERCLA, allows parties to allocate indemnification costs between them. Haw. Rev. Stat. § 128D-6(g). HERL also allows for recoverable costs for 'remedial or removal action' Id. at § 128D-5." Kugle v. Island Cement, LCC, No. CV 09-00351 DAE BMK, 2010 WL 4960009, at *15 (D. Hawai`i. Nov. 30, 2010). The State Contingency Plan ("SCP") is set forth in Haw. Admin. R. title 11, chapter 451.

Wond Family alleges it has established all of the elements of CERCLA and HERL violations, and Continental Tire alleges Wond Family has not, and cannot, do so. The evidence discussed above shows there is conflicting evidence regarding the elements of Wond Family's claims. This Court finds there are genuine issues of material fact that preclude summary judgment in favor of either party as to Counts I, II, and III. Wond Family's Counts I-III Motion and Continental's Counts I-III Motions are therefore denied without prejudice to refiling should definitive evidence be able to be presented to the Court.

## CONCLUSION

On the basis of the foregoing, Wond Family's Motion for Partial Summary Judgment Re: Count IV of Complaint, filed October 6, 2017, is HEREBY GRANTED IN PART AND DENIED IN PART. The following motions are HEREBY DENIED, in their entirety: Continental Tire's Motion for Summary Judgment as to Counts I, II, and III of Plaintiff's Complaint; Continental Tire's Motion for Summary Judgment as to Count IV of Plaintiff's Complaint; and Continental Tire's Motion for Summary Judgment as to Count V of Plaintiff's Complaint; all filed October 6, 2017; and Wond Family's Motion for Partial Summary Judgment Re: Counts I, II, and III of Complaint; filed October 11, 2017.

Specifically, Wond Family's Count IV Motion is GRANTED insofar as this Court rules that: 1) holdover rent is an available remedy for commercial lessors under Hawai`i common law; and 2) through the Assignment, Continental Tire assumed all of the Lessee's obligations in the Sublease. Wond Family's Count IV Motion is DENIED in all other respects.

IT IS SO ORDERED.

DATED AT HONOLULU, HAWAII, May 1, 2018.



   /s/ Leslie E. Kobayashi
Leslie E. Kobayashi
United States District Judge

WOND FAMILY KAPALAMA, LLC vs. CONTINENTAL TIRE THE AMERICAS, LLC, ETC.; CIVIL 16-00676 LEK-KJM; ORDER GRANTING IN PART AND DENYING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT RE: COUNT IV OF THE COMPLAINT AND DENYING ALL OTHER MOTIONS FOR SUMMARY JUDGMENT